AMERICAN–ARAB ANTI–DISCRIMINA-TION COMMITTEE, et al., Plaintiffs,

v.

Edwin MEESE, III, et al., Defendants.

No. CV 87–02107–SVW.

United States District Court, C.D. California.

Jan. 26, 1989.

As Amended Aug. 31, 1989.

Paul L. Hoffman, ACLU Foundation of So. California, Dan Stormer, National Lawyers Guild, Los Angeles, Cal., Marc Van Der Hout, National Lawyers Guild, San Francisco, Cal., David Cole, Michael Ratner, Center For Constitutional Rights, New York City, Wade Henderson, Hope Nakamura, American Civil Liberties Union, Washington, D.C., Peter Schey, Nat. Center for Immigrants Rights, Inc., Los Angeles, Cal., for plaintiffs.

George H. Wu, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

WILSON, District Judge.

Plaintiffs Khader Musa Hamide and Michel Ibrahim Shehadeh ("Hamide and Shehadeh"); Bashar Amer, Ayman Mustafa Obeid, Julie Nuangugi Mungai, Aiad Khaled Barakat, Naim Nadim Sharif, Amjad Mustafa Obeid ("Other Six"); American–Arab Anti–Discrimination Committee, Arab–American Democratic Federation, Association of Arab American University Graduates, Irish National Caucus, Palestine Human Rights Campaign, American Friends Service Committee, League of United Latin American Citizens, Michel Bo-

gopolsky, Darrel Meyers, and Southern California Interfaith Task Force on Central America ("Organizational Plaintiffs") move the Court for summary judgment and for declaratory and injunctive relief. They challenge the constitutionality of Sections 241(a)(6)(D), (F)(iii), (G)(v), and (H) of the McCarran–Walter Act of 1952, ("McCarran–Walter provisions"), codified in 8 U.S.C. §§ 1251(a)(6)(D), (F)(iii), (G)(v), and (H),[1] and of Sections 901(a) and 901(b) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 ("FRAA"), Pub.L. No. 100–204, § 901, 101 Stat. 1331, 1399 (1987) (amended October 1, 1988).[2]

1. 8 U.S.C. § 1251(a)(6) provides in pertinent part:

(a) General classes

Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

.  .  .  .  .

(6) is or at any time has been after entry, a member of any of the following classes of aliens:

.  .  .  .  .

(D) Aliens not within any of the other provisions of this paragraph who advocate the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, or who are members of or affiliated with any organization that advocates the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, either through its own utterances or through any written or printed publications issued or published by or with the permission or consent of or under the authority of such organization or paid for by the funds of, or funds furnished by, such organization;

.  .  .  .  .

(F) Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches ... (iii) the unlawful damage, injury, or destruction of property; ...

(G) Aliens who write or publish, or cause to be written or published, or who knowingly circulate, distribute, print, or display, or knowingly cause to be circulated, distributed, printed, published, or displayed, or who knowingly have in their possession for the purpose of circulation, publication, distribution, or display, any written or printed matter, advocating or teaching opposition to all organized government, or advocating or teaching ... (v) the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship;

(H) Aliens who are members of or affiliated with any organization that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display any written or printed matter of the character described in paragraph (G) of this subdivision.

2. The amended version of Section 901 provides in pertinent part:

Sec. 901. PROHIBITION ON EXCLUSION OR DEPORTATION OF ALIENS ON CERTAIN GROUNDS

(a) IN GENERAL.—Notwithstanding any other provision of law, no nonimmigrant alien may be denied a visa or excluded from admission into the United States, or subject to deportation because of any past, current or expected beliefs, statements or associations which, if engaged in by a United States citizen in the United States, would be protected under the Constitution of the United States.

(b) CONSTRUCTION REGARDING EXCLUDABLE ALIENS.—Nothing in this shall be construed as affecting the existing authority of the executive branch to deport, to deny issuance of a visa to, to deny adjustment of status of, or to deny admission to the United States of, any alien—

(1) for reasons of foreign policy or national security, except that such deportation or denial may not be based on past, current, or expected beliefs, statements, or associations which, if engaged in by a United States citizen in the United States, would be protected under the Constitution of the United States, unless such alien is seeking issuance of a visa, adjustment of status, or admission to the United States as an immigrant;

(2) who a consular official or the Attorney General knows or has reasonable ground to believe has engaged, in an individual capacity or as a member of an organization, in a terrorist activity or is likely to engage after entry in a terrorist activity; or

Defendants Edwin Meese, III, Alan Nelson, Harold Ezell, Ernest Gustafson, and the Immigration and Naturalization Service ("Government") move the Court to dismiss the action for lack of jurisdiction and for failure to state a claim or for judgment on the pleadings.

We conclude that the Other Six and the American–Arab Anti–Discrimination Committee ("ADC") have standing to challenge the McCarran–Walter provisions. On the merits, we hold that aliens who are legally within the United States are protected by the First Amendment of the United States Constitution and that this protection is not limited in the deportation arena by the Government's plenary immigration power. Applying established First Amendment principles, we find that the McCarran–Walter provisions are substantially overbroad in violation of the First Amendment. We therefore grant Plaintiffs' motion for summary judgment and request for declaratory relief. As these rulings provide Plaintiffs with an adequate remedy at law, we deny their request for injunctive relief. *See Beacon Theatres v. Westover*, 359 U.S. 500, 509, 79 S.Ct. 948, 956, 3 L.Ed.2d 988 (1959). We further deny the Government's motion for judgment on the pleadings and its motion to dismiss for lack of jurisdiction or failure to state a claim. Our holding that all aliens are entitled to First Amendment protections in the deportation setting obviates the need to address the constitutionality of Sections 901(a) and 901(b) of the FRAA.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Immigration and Naturalization Service ("INS") first commenced deportation proceedings against Hamide, Shehadeh, and the Other Six in January of 1987 alleging that these aliens were deportable under the McCarran–Walter provisions. Specifically, the Government charged them with being members of or affiliated with the Popular Front for the Liberation of Palestine ("PFLP"), an organization that advocated the economic, international and governmental doctrines of world communism through written and/or printed publications issued on or under the authority of such organization. On April 23, 1987, the INS abandoned the proceedings against all the aliens on these charges. New McCarran–Walter Act charges were brought against Hamide and Shehadeh under Section 241(a)(6)(F)(iii) of the McCarran–Walter Act ("Section (F)(iii)") while the Other Six were charged with non-ideological immigration violations under 8 U.S.C. §§ 1251(a)(2) and 1251(a)(9).

This Court first heard challenges to the deportation proceedings and the constitutionality of the McCarran–Walter provisions in April of 1987. In our May 21, 1987 and June 3, 1987 Orders, we held that the matter was not ripe for decision because Hamide and Shehadeh had not exhausted their administrative remedies with the INS and because a direct review of the statute was available through mandamus to the Ninth Circuit Court of Appeals. The Court of Appeals in its February 24, 1988 Order agreed that the case was not justiciable and refused to review the statute because Hamide and Shehadeh had not exhausted their administrative remedies.

In 1987, after we first held hearings in this matter, Congress passed the FRAA which provided in Section 901(a), *inter*

---

(3) who seeks to enter in an official capacity as a representative of a purported labor organization in a country where such organizations are in fact instruments of a totalitarian state.

In addition, nothing in subsection (a) shall be construed as applying to an alien who is described in section 212(a)(33) of the Immigration and Nationality Act (relating to those who assisted in the Nazi persecutions), to an alien described in the last sentence of section 101(a)(42) of such Act (relating to those assisting in other persecutions) who is seeking the benefits of section 207, 208, 243(h)(1), or 245A of such Act (relating to admission as a refugee, asylum, withholding of deportation, and legalization), or to an alien who is described in section 21(c) of the State Department Basic Authorities Act of 1956 [members of the Palestine Liberation Organization ("PLO")]. In paragraph (2), the term "terrorist activity" means the organizing, abetting, or participating in a wanton or indiscriminate act of violence with extreme indifference to the risk of causing death or serious bodily harm to individuals not taking part in armed hostilities.

*alia,* that aliens could not be deported on the basis of expression or beliefs that would be protected by the First Amendment if engaged in by United States citizens. Section 901(b) of the FRAA carved out several exceptions to the general rule stated in Section 901(a). In particular, Section 901(b) excepts members of the PLO from the protection of Section 901(a).[3] This statute was thereafter modified in October 1988 so that it applied only to nonimmigrant aliens.[4]

After the Ninth Circuit's decision, Hamide, Shehadeh, the Other Six, and the Organizational Plaintiffs again asked this Court to review the constitutionality of the McCarran–Walter provisions and Section 901(a) and Section 901(b) of the FRAA. We first address their standing to make these challenges.

## DISCUSSION

### I. STANDING

#### A. *Standing of Hamide and Shehadeh*

■ In its May 21, 1987 and June 3, 1987 Orders, this Court dismissed Hamide and Shehadeh's claim on the basis that they could seek interlocutory review of their claim by the Ninth Circuit under the All Writs Act, 28 U.S.C. § 1651. In its February 24, 1988 Order, the Ninth Circuit denied Hamide and Shehadeh's petition for a writ of mandamus. *Hamide v. United States District Court,* No. 87–7249 (9th Cir. Feb. 24, 1988). The Court of Appeals expressly declined to consider the constitutional issue posed by the petition, stating that the petitioners had not exhausted their administrative remedies. In addition, the

Court of Appeals ruled that this Court lacked jurisdiction to hear Hamide and Shehadeh's constitutional challenge to Section (F)(iii).

Since Hamide and Shehadeh have still not exhausted their administrative remedies and the Ninth Circuit retains exclusive jurisdiction under 8 U.S.C. § 1105a to review their final deportation order, this Court lacks jurisdiction to hear their claim. Acting pursuant to the Ninth Circuit's Order, this Court denies standing to Hamide and Shehadeh to challenge the McCarran–Walter provisions or Section 901 of the FRAA.

#### B. *Standing of the Other Six*

Under Article III of the United States Constitution and the express terms of the Federal Declaratory Judgment Act, 28 U.S. C. § 2201, federal courts may hear legal claims only if they arise from an "actual controversy."[5] A case or controversy requires a plaintiff to have a personal stake in the outcome sufficient to assure an adversarial presentation of the case. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *Hardwick v. Bowers,* 760 F.2d 1202, 1204 (11th Cir. 1985), *rev'd on other grounds,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); *see also Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972) (an "actual controversy" under the Declaratory Judgment Act exists when " 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' ") (quoting *Maryland Cas-*

---

3. We will refer to this Section 901(b) exception for PLO members as the "PLO Exception."

4. Under 8 U.S.C. § 1101(a)(15), all aliens are presumed to be immigrant aliens unless they fall within one of the specifically enumerated classes of nonimmigrant aliens. For example, among the Other Six, Naim Nadim Sharif and Aiad Khaled Barakat were admitted under 8 U.S.C. § 1101(a)(15)(B) as temporary visitors; Julie Nuangugi Mungai was admitted under 8 U.S.C. § 1101(a)(15)(H)(i) as a temporary worker; and Amjad Mustafa Obeid, Ayman Mustafa Obeid, and Bashar Amer were admitted under 8 U.S.C. § 1101(a)(15)(F) as students.

5. 28 U.S.C. § 2201(a) provides:

In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

ualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

For a plaintiff to have standing under Article III and the Declaratory Judgment Act, he or she must, "at an irreducible minimum," claim that he or she has "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The case or controversy requirement is therefore closely related to the standing requirement. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *San Francisco County Democratic Central Committee v. Eu*, 826 F.2d 814, 822 (9th Cir.1987). Both standards depend on whether Plaintiffs can demonstrate that they face a sufficiently "real and immediate" threat of prosecution under the McCarran–Walter provisions and Section 901 of the FRAA. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103, 103 S.Ct. 1660, 1665–66, 75 L.Ed.2d 675 (1983); *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969).

In defining what constitutes a "real and immediate" threat, courts have contrasted this type of threat to one that is merely "conjectural or hypothetical," *Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665; *Zwickler*, 394 U.S. at 109–10, 89 S.Ct. at 960–61 "imaginary and speculative," *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974), or "chimerical," *Poe v. Ullman*, 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961). To allege a "real" threat in the First Amendment context, a plaintiff must show that the challenged law not only subjectively chills his First Amendment rights but also objectively chills them by threatening "specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). What consti-

tutes an "immediate" threat of prosecution has been the subject of dispute between the parties.

The Government contends that "'immediate' means 'now'"; in other words, the threat's immediacy must be exceptionally great and a plaintiff must be facing imminent charges and an almost certain conviction. Gov't Memo. of Nov. 9, 1988, at 1–4. Plaintiffs argue that "immediate" refers to the chilling effect on a plaintiff's First Amendment rights that occurs whenever a plaintiff faces a real threat of prosecution. Plaintiff Supp. Memo. of Nov. 14, 1988, at 2–3. The question thus framed is whether Plaintiffs must face a threat of an "immediate prosecution" or whether they satisfy the "immediate" requirement by alleging an "immediate chill" from a threat of a credible, potential prosecution.

We believe that the terms "immediate prosecution" and "immediate chill" are inextricably intertwined. In any given situation, the more "immediate" the threat of prosecution, the more "immediate" the chill. *See Polykoff v. Collins*, 816 F.2d 1326, 1331 (9th Cir.1987). A pre-enforcement First Amendment challenge does not necessarily require a plaintiff to confront a threat of prosecution the next day, the next week or the next month to have standing. The threat of prosecution simply cannot be too remote in the future so as to be no longer real and objectively-based. Thus, if any member of the Other Six demonstrates that he or she faces a sufficiently real and immediate threat of prosecution under the challenged statutes that immediately chills him or her from exercising his or her First Amendment rights, the threat of prosecution will be considered suitably "real and immediate" to satisfy the standing and Article III case or controversy requirements.

The Government avers that none of the Other Six faces a real and immediate threat of prosecution under the McCarran–Walter provisions and Section 901(b) of the FRAA and that they should therefore be denied standing. Specifically, the Government maintains that in the past thirty-six years, the McCarran–Walter provisions have rarely been invoked. It is too specu-

lative, it argues, to believe that it would charge the Other Six under the McCarran–Walter provisions after such charges have already been brought and dropped. The Other Six are already alleged to be deportable on the basis of routine immigration status violations.[6] There would be no reason for the Government to pursue the far more complex and time-consuming course of bringing McCarran–Walter provisions charges against them. Hence, the Government argues, any chill the Other Six might be suffering is too subjective and remote given the unlikelihood that the Government will prosecute under these charges. Gov't Memo. of Sept. 2, 1988 at 8.

In order to estimate whether a party faces a real and immediate threat of prosecution and chill of his or her First Amendment rights, courts have examined the government's interest in enforcing the challenged statute, along with its past enforcement patterns, and the party's interest in engaging in the prohibited activity. *See Hardwick*, 760 F.2d at 1205; *American Baptist Churches in the U.S.A. v. Meese*, 666 F.Supp. 1358, 1363 (N.D.Cal.1987).

The Government in this case has demonstrated that it has an interest in excluding and deporting PFLP members generally and enforcing the McCarran–Walter provisions against alleged PFLP members and the Other Six specifically. Over the last two and a half years, the Government has engaged in exclusion and deportation actions against aliens who it alleged were PFLP members. For instance, in May 1986 the Government excluded and deported Suliemann Shehadeh under Sections 212(a)(27) and 212(a)(29) of the Immigration and Nationality Act because of his affiliation with the PFLP. Decision of Immigration Judge, File No. 838–399–412 (May 22, 1986). The Government has further initiated summary exclusion proceedings in December 1987 under 8 U.S.C. § 1225(c) against Fouad Rafeedie, a permanent resident alien, because of his PFLP affiliation. Notice of

Initiation of Summary Exclusion under Section 235(c), File No. 34–679–905 (December 31, 1987); *see Rafeedie v. INS*, 688 F.Supp. 729 (D.D.C.1988).

The Government's desire to utilize the McCarran–Walter provisions against PFLP members is manifested in its current attempt to deport Hamide and Shehadeh for violating Section (F)(iii) by being members of or affiliating with an organization that advocates or teaches the unlawful damage, injury or destruction of property. In particular, the Government has based these charges on Hamide and Shehadeh's alleged membership or affiliation with the PFLP. *In re Shehadeh*, File No. A30–660–528 (April 28, 1987) (Substituted Charges of Deportability); *In re Hamide*, File No. A19–262–560 (April 28, 1987) (Substituted Charges of Deportability).

While the Other Six need not allege a specific threat of prosecution against them individually to have standing, *Hardwick*, 760 F.2d at 1205, in this case they can. The Government has expressly stated that it considers the Other Six to fall within the class of persons who are properly deportable under the McCarran–Walter provisions. This is evidenced by the statement of former F.B.I. Director William H. Webster who, in the 1987 hearings concerning the confirmation of his nomination to be Director of Central Intelligence, declared: "[A]ll of them [the Other Six, Hamide and Shehadeh] were arrested because they are alleged to be members of a world-wide Communist organization which under the McCarran Act makes them eligible for deportation ... in this particular case if these individuals had been United States citizens, there would not have been a basis for their arrest." *Hearings Before the Senate Select Committee on Intelligence on Nomination of William H. Webster, to be Director of Central Intelligence*, 100th Cong. 1st Sess. 94, 95 (April 8, 9, 30 1987; May 1, 1987).

---

**6.** Bashar Amer, Aiad Khaled Barakat, Julie Nuangugi Mungai, Naim Nadim Sharif, Amjad Mustafa Obeid, and Ayman Mustafa Obeid have been served with Orders to Show Cause that include a charge under 8 U.S.C. § 1251(a)(2)

that each "overstayed" his or her visa term. Bashar Amer's Order to Show Cause additionally charged him with failing to maintain student status under 8 U.S.C. § 1251(a)(9).

In addition to stating its prosecutorial interest against the Other Six, the Government has already brought charges against them under the McCarran–Walter provisions in January, 1987, dropping the charges over twelve weeks later at the April 23, 1987 hearing before the Court. The Government has not disavowed its intent to bring these same charges against the Other Six in the future despite ample opportunity to do so.

As for the Other Six, we must assess their interest in engaging in the type of First Amendment actions deemed deportable under the McCarran–Walter provisions. The Other Six allege that but for the McCarran–Walter provisions and Section 901(b) of the FRAA, they would engage in the expressive activities that led the INS to charge them under the McCarran–Walter provisions in 1987. *See* Mungai Supp. Declaration ¶ 6; Amer Declaration ¶ 4; Amjad Obeid Declaration ¶¶ 4–5; Barakat Declaration ¶¶ 4–5. These activities include reading and distributing magazines published by the PFLP, supporting or discussing the PFLP or its views in public meetings and demonstrations, and raising money to support these activities. *See* Second Amended Complaint ¶ 22. While a plaintiff hoping to challenge a statute might tend to exaggerate his or her intention to participate in the proscribed actions, we believe that the Other Six do not allege their desire to pursue the First Amendment activities prohibited by the McCarran–Walter provisions merely as a ruse to obtain standing. On the contrary, after reading the submitted declarations, we find that the Other Six demonstrate an authentic interest in participating in the prohibited First Amendment activities as part of their normal course of activity. *See Hardwick*, 760 F.2d at 1205.

After examining the parties' interests, we conclude that the Government has demonstrated a strong interest in prosecuting PFLP members under the immigration laws generally and the Other Six and other PFLP members under the McCarran–Walter provisions in particular. The Other Six have evinced a genuine interest in engaging in the proscribed conduct. Under these circumstances, the Other Six confront a sufficiently real and immediate threat of prosecution under the McCarran–Walter provisions to establish their standing to challenge these provisions.

In addition to the interest analysis conducted above, relevant case law supports the Other Six's standing. In *Hardwick, supra*, the State arrested and charged plaintiff Hardwick, a practicing homosexual, with violating Georgia's sodomy statute, only to subsequently drop these charges. The *Hardwick* Court found that though the State had dropped the charges, the State had not declared that it would not prosecute Hardwick in the future under the challenged law. Viewing the evidence of past prosecution as raising a strong inference that future prosecutions were likely, the Court concluded that Hardwick had standing to contest Georgia's sodomy statute. *Hardwick*, 760 F.2d at 1205 ("[a] past enforcement effort often will confirm the reasonableness of a plaintiff's subjective fear of prosecution"). Similarly, in this case, the past prosecution of the Other Six confirms the reasonableness of their fear of prosecution and raises a strong inference that future prosecutions are likely.

Distinguishing *Hardwick* from this case, the Government argues that Hardwick did not face any alternate sodomy charges other than those under the challenged sodomy law. The inference was strong in that case that future prosecutions under the challenged sodomy law would be likely because no other sodomy law existed under which Hardwick could have been prosecuted. Here, the Other Six currently face routine status deportation charges, making future prosecutions under the McCarran–Walter provisions too remote and unlikely.

In *Hardwick*, however, the Court granted Hardwick standing even though he did not allege other specific instances of prosecution of similarly situated homosexuals under the challenged sodomy law. To that extent, the Other Six present a more real and immediate threat of prosecution, relying not just on their previous prosecution but also on the current prosecutions against Hamide and Shehadeh. *See Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct.

1209, 1215–16, 39 L.Ed.2d 505 (1974) (where plaintiff had not been arrested under the statute, the prosecution of his companion under the statute is "ample demonstration that [plaintiff's] concern with arrest has not been 'chimerical'," citing *Poe v. Ullman*, 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961)).

Furthermore, the Government, like the State in *Hardwick*, has not disavowed its intent to enforce the challenged provisions. *See Hardwick*, 760 F.2d at 1206; *see also Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988) (standing found for booksellers because, *inter alia*, "[t]he State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 302, 99 S.Ct. 2301, 2311, 60 L.Ed.2d 895 (1979) (standing upheld for unions because, *inter alia*, "the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices"). Nor has the Government claimed that it has *never* enforced these provisions despite aliens "commonly and notoriously" violating them. Only where the Government has met one or both of these conditions, disavowal of intent to enforce or complete nonenforcement in the face of common and notorious violations, have courts found that the threat of prosecution was not real and immediate. *Compare Poe v. Ullman*, 367 U.S. at 502, 508, 81 S.Ct. at 1755, 1758 (threat of prosecution under Connecticut law banning contraceptives held "chimerical" because the ban had never been enforced during its over seventy-five year history even though contraceptives were commonly and notoriously sold in Connecticut drug stores); *with San Francisco Democratic Central Committee v. Eu*, 826 F.2d 814, 822 (9th Cir.1987) (standing found

despite State's total nonenforcement of challenged Election Code provisions because no record shown that provisions were commonly and notoriously violated).

Where plaintiffs genuinely allege that but for the challenged statute, they would engage in the proscribed First Amendment activities, courts have granted them standing even when the statute has never been enforced or has never been enforced against them. In the first category where a statute has never been enforced against anyone, the Supreme Court has recognized a plaintiff's standing to contest the statute. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988) (conferring standing to booksellers to challenge never-enforced statute restricting display of sexually explicit literature); *City of Lakewood v. Plain Dealer Pub. Co.*, —— U.S. ——, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (granting standing to newspaper publisher to contest never-enforced municipal ordinance requiring licensing for placement of newsracks on public property). The Ninth Circuit reached a similar conclusion in *San Francisco Democratic Central Committee, supra*. In that case, the Court determined that the plaintiffs had standing to lodge a First Amendment challenge to various sections of the California Elections Code even though the State had never invoked these sections against any political organization. The Court specifically relied on the Supreme Court's decision in *Epperson v. Arkansas*, 393 U.S. 97, 101–02, 89 S.Ct. 266, 268–69, 21 L.Ed.2d 228 (1968), where a teacher was granted standing to challenge a statute prohibiting the teaching of evolution, even though the statute had never been enforced against anyone during its forty years on the record books. *San Francisco Democratic Central Committee*, 826 F.2d at 822.[7]

---

7. The *San Francisco Democratic Central Committee* Court further noted that "the aftermath of *Poe* teaches that federal courts should not lightly determine that a statute has fallen into desuetude." 826 F.2d at 822 n. 15. *Compare Poe v. Ullman, supra; with Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Connecticut statute banning contracep-

tives that the Supreme Court found a dead letter in *Poe* struck down after the State prosecuted two persons, including a doctor, for openly counseling married persons on the use of contraceptives). Similarly, in this case, though the Government has rarely used the McCarran–Walter provisions in their thirty-six year history, it

In the second category, courts have conferred standing on plaintiffs to challenge statutes that impinge on their constitutional rights, even though those plaintiffs had never been personally subjected to prosecution under the statutes. This type of pre-enforcement challenge, the type of challenge at issue in the instant case, allows a plaintiff to contest a statute without having to expose himself to an actual arrest or prosecution or deportation. *See Babbitt,* 442 U.S. at 298–99, 99 S.Ct. at 2308–09 (upheld pre-enforcement challenge to provisions of the Arizona farm labor statute despite plaintiffs never having been charged under the provisions); *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974) (sustained pre-enforcement First Amendment challenge to Georgia criminal trespass law for a plaintiff never prosecuted under the statute); *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (allowed pre-enforcement challenge by doctors to Georgia abortion statute "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes"); *Sable Communications of California, Inc. v. FCC,* 827 F.2d 640, 643–44 (9th Cir.1987) (permitted pre-enforcement First Amendment challenge to federal obscene telephone call statute by a plaintiff whom the State had never prosecuted under the statute); *Polykoff v. Collins,* 816 F.2d at 1331 (upheld pre-enforcement challenge to Arizona criminal obscenity statute where plaintiffs had never been prosecuted).

Particularly with pre-enforcement First Amendment challenges, courts have found standing based, in part, on their sensitivity to the danger of "self-censorship[,] a harm that can be realized even without an actual prosecution." *American Booksellers,* 108 S.Ct. at 642; *see Dombrowski v. Pfister,* 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965) (" '[t]he threat of sanctions may deter [the lawful exercise of First Amendment rights] ... almost as potently as the actual application of sanc-

tions' " (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)); *Polykoff, supra* (plaintiffs granted standing to lodge a pre-enforcement First Amendment challenge because, *inter alia,* the chilling of protected speech under Arizona's statutory system for obscenity would be "immediate").

The Other Six have demonstrated that the Government has used the McCarran–Walter provisions to quell their First Amendment activities in the past, is currently prosecuting other alleged PFLP members under these provisions, and has not disavowed its intent to prosecute the Other Six in the future. As such, they present a stronger case for standing than did the plaintiffs in *American Booksellers, Lakewood, Epperson,* and *San Francisco Democratic Central Committee* where the statute at issue had never been enforced. The standing of the Other Six is also more compelling than the plaintiffs' standing in *Babbitt, Steffel, Doe, Polykoff,* and *Sable* where the plaintiffs had never been prosecuted under the challenged statute.

We agree with the Government that were the Other Six only to allege a "subjective chill" based on the mere existence of the McCarran–Walter provisions and Section 901(b) of the FRAA without anything more concrete, they would not be entitled to standing. *See Laird v. Tatum,* 408 U.S. at 10–14, 92 S.Ct. 2318, 2324–26, 33 L.Ed.2d 154 (denied standing to plaintiff who alleged "subjective chill" of First Amendment rights due to mere existence, without more, of a governmental investigative and data-gathering activity); *Younger v. Harris,* 401 U.S. 37, 41–42, 91 S.Ct. 746, 749–50, 27 L.Ed.2d 669 (1971) (denied standing to plaintiffs who did not claim that they had ever been threatened with prosecution, that a prosecution was likely, or even that a prosecution was remotely possible); *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1378–81 (D.C.Cir.1984) (denied standing to plaintiffs who did not adequately aver that any specific action is threatened or even contemplated against them; their alleged harms

has recently resurrected these provisions for use     against PFLP members.

constituted "nothing more than a generalized grievance against the intelligence-gathering methods sanctioned by the President"); *Hardwick*, 760 F.2d at 1206 (rejected standing of Does, the heterosexual couple, because they did not allege a realistic threat of prosecution, only that the existence of the sodomy statute plus Hardwick's arrest chilled their actions). Unlike the plaintiffs in *Laird, Younger, United Presbyterian Church*, and *Hardwick*, however, the Other Six have not only claimed that they are chilled from the statutes in question but that they face a "very real threat" of prosecution under these statutes. Mungai Supp. Declaration ¶ 3. This "very real threat" of prosecution is substantiated by past and present concrete instances of prosecution under the McCarran–Walter provisions. In contrast to the plaintiffs in *Lyons*, 461 U.S. at 105–08, 103 S.Ct. at 1666–68 (recurrence of allegedly unlawful police treatment of plaintiff found too speculative to warrant standing), *Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 604–05, 46 L.Ed.2d 561 (1976) (same), and *O'Shea v. Littleton*, 414 U.S. 488, 493–97, 94 S.Ct. 669, 674–75, 38 L.Ed.2d 674 (1974) (same), the Other Six have properly established the *"reality* of the threat of repeated injury," *Lyons*, 461 U.S. at 107 n. 8, 103 S.Ct. at 1668 n. 8 (emphasis in original).

Moreover, while both the *Laird* and *United Presbyterian Church* courts denied standing, they acknowledged that standing would exist where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Laird*, 408 U.S. at 11, 92 S.Ct. at 2324; *United Presbyterian Church*, 738 F.2d at 1378 (quoting *Laird* ). The Ninth Circuit relied on this distinction to find standing in *Sable Communications of California, supra.* In that case, the

Court granted the plaintiff pre-enforcement standing to challenge a statute regulating sexually explicit telephone services. The Court noted that the government considered the statute to be applicable to the plaintiff, that the government specifically declined to agree not to enforce the statute against the plaintiff, that the penalties for noncompliance were substantial, and that the government had prosecuted one of the plaintiff's competitors under the statute. Under these circumstances, the Court found that the statute was compulsory in nature and that the plaintiff was currently subject to its requirements. *Sable*, 827 F.2d at 643–44.

In the case at bar, as in *Sable*, the Government considers the McCarran–Walter provisions and Section 901(b) of the FRAA to be applicable to the Other Six [8] and has specifically refused to state that it will not bring such charges against them. The penalty for the statute's violation—deportation—is substantial, and the Government is proceeding against two other alleged PFLP members under the statute. As in *Sable*, the challenged provisions are compulsory as well as proscriptive in nature. As aliens, the group directly targeted by the statute, the Other Six are presently subject to the statute's requirements. *See Doe v. Bolton*, 410 U.S. at 188, 93 S.Ct. at 745 (pre-enforcement standing found for doctors, "against whom these criminal statutes directly operate"). Hence, like in *Sable*, the threat of prosecution facing the Other Six is not too "speculative" or "hypothetical," *Sable*, 827 F.2d at 643, to warrant the invocation of federal jurisdiction.

Under the above analysis, we conclude that each member of the Other Six faces a "real and immediate" threat of prosecution under the McCarran–Walter provisions and Section 901 of the FRAA. They therefore present an objectively-based and "immedi-

---

**8.** Since the Government has expressly stated at oral argument and in its briefs, *see e.g.,* Gov't Memo. of Sept. 2, 1988, at 29–31, that it considers the PLO Exception to apply to PFLP members, we do not reach the issue of whether the PLO Exception *encompasses solely PLO mem- bers or affiliate groups'* members as well. The

fact that the Government treats PFLP members as within Section 901(b)'s exception to Section 901(a)'s constitutional protections heightens the reality and immediacy of the threat of prosecution faced by alleged PFLP members, like the Other Six, under the McCarran–Walter provisions.

ate" chill of their First Amendment rights sufficient to provide them with standing.

## C. *Organizational Plaintiffs*

In *New York State Club Ass'n v. City of New York,* —— U.S. ——, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), the Supreme Court reiterated its test set forth in *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), for determining whether an organization has standing to sue on behalf of its members. Under that test, an organization has standing "when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *New York State Club,* 108 S.Ct. at 2231–32 (quoting *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441).

■ The Court holds that the ADC has met the three-part *Hunt* test for associational standing. Under the first prong of the test, an organization must allege "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit...." *Hunt,* 432 U.S. at 342, 97 S.Ct. at 2441 (quoting *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975)). Applying the same analysis to the ADC's members as was used to measure whether the Other Six faced a real and immediate threat of prosecution, we find that the ADC's members confront a similar threat of prosecution under the McCarran–Walter provisions and Section 901(b) of the FRAA.

The ADC represents both immigrant and nonimmigrant aliens who would support the PFLP and hold PFLP views but for the real threat that the INS would institute deportation proceedings against them under the McCarran–Walter provisions. Mokhiber Fifth Declaration ¶ 2 (Mokhiber is currently the Director of the Legal Services Department of the ADC). After reading the submitted declarations, we view these ADC members' desire to engage in the proscribed activities as genuine. Moreover, the Government demonstrates a continuing interest in enforcing the McCarran–Walter provisions against these members. This interest is evidenced by the Government's past prosecutions against alleged PFLP members (Suliemann Shihadeh and Fouad Rafeedie), its past prosecution of the Other Six as alleged PFLP members under the McCarran–Walter provisions, its current enforcement of one of the McCarran–Walter provisions against Hamide and Shehadeh for their alleged PFLP membership, and its refusal to disavow its intent to enforce these provisions in the future. *Compare Hardwick,* 760 F.2d at 1206 (heterosexual couple denied standing where court could determine that a heterosexual couple was in a different position from a homosexual when the State had only demonstrated an interest in prosecuting homosexuals under the sodomy statute); *Younger v. Harris,* 401 U.S. at 41–42, 91 S.Ct. at 748–49 (three intervenors denied standing because they never claimed to be threatened with prosecution under the challenged statute or that a prosecution was likely or even remotely possible). Unlike the Other Six, the ADC members do not face routine deportation charges for status violations; this lack of an alternative avenue through which the Government could deport them heightens the reality and immediacy of the threatened prosecution under the McCarran–Walter provisions. Therefore, the ADC members would have standing to sue in their own right.

Under the second prong of the *Hunt* test, the interest the organization seeks to protect must be germane to the organization's purpose. The Government avers that the ADC merely has an "abstract and unconnected concern" with respect to the McCarran–Walter provisions since its purpose is not to violate these provisions. Gov't Memo. of Sept. 2, 1988, at 16. While the ADC does not define its purpose in terms of violating deportation laws, it does state its purpose to be the defense of the rights and promotion of the heritage of Arab–Americans through legal action in

cases of discrimination and immigration and publication of information on issues of concern to Arab–Americans. Second Amended Complaint ¶ 7. Since the interests the ADC seeks to protect in this case are the constitutional rights for its Arab–American members, including immigrant aliens and nonimmigrant aliens, to engage in First Amendment activities proscribed by the McCarran–Walter provisions, we find that these interests are germane to the ADC's purpose.

Under the third prong, we find that the claims for declaratory and injunctive relief asserted by the ADC do not require the participation of the individual members in the lawsuit. In a facial challenge such as this, "there is complete identity between the interest of the [ADC] and those of its member[s] ... with respect to the issues raised in this suit, and the necessary proof [can] be presented 'in a group context.'" New York State Club, 108 S.Ct. at 2232 n. 4 (quoting Hunt, 432 U.S. at 344, 97 S.Ct. at 2442). The ADC thus meets the Hunt criteria for associational standing.

In addition, because the ADC represents immigrant aliens as well as nonimmigrant aliens, the ADC presents a sufficiently different claim than the Other Six to warrant its standing. In contrast to the nurse, clergy, social worker and corporation-appellants in Doe v. Bolton, 410 U.S. at 189, 93 S.Ct. at 746, whose standing the Supreme Court rejected because their claims were already sufficiently presented by the other plaintiffs, the immigrant alien ADC members state non-duplicative claims. We conclude that the ADC enjoys standing to challenge the McCarran–Walter provisions and Section 901(b) of the FRAA.[9]

## D. Prudential Considerations

■ Notwithstanding the Other Six's and the ADC's standing under Article III, the Government submits that the Court should refrain from determining the consti-

tutionality of the McCarran–Walter provisions and Section 901 of the FRAA for prudential considerations. First, the Government asserts that the Ninth Circuit has exclusive jurisdiction to review final orders of deportation under 8 USC § 1105a. Second, the Ninth Circuit has already stated in Hamide v. United States District Court, supra, that it will not rule on the constitutionality of Section (F)(iii), under which Hamide and Shehadeh are being prosecuted, because they have not exhausted their administrative remedies. Third, by ruling on the Other Six's and the ADC's constitutional attacks on the McCarran–Walter provisions, this Court would be thwarting Congress's intent to place exclusive jurisdiction in the Ninth Circuit and to have no court review the deportation proceedings until a factual record has been developed at the deportation hearing. Fourth, if this Court proceeded to adjudicate their claims, it would create parallel tracks of litigation between itself and the Ninth Circuit, inefficiently use judicial resources, and create the possibility of conflicting decisions. Fifth, it would be anomalous to allow the Other Six or the ADC to challenge the statutes at issue when the only parties currently charged under those statutes, Hamide and Shehadeh, have been foreclosed from mounting such a challenge before this Court. See Gov't Memo. of Sept. 2, 1988, at 4–7, 17–20.

While the Court in its May 21, 1987 and June 3, 1987 Orders dismissed Hamide and Shehadeh's claims and stayed the Other Six's and the ADC's claims for prudential considerations, such considerations are no longer applicable. In our previous Orders, we specifically relied on Hamide and Shehadeh's ability to seek a preemptory writ of mandamus from the Ninth Circuit to rule on the constitutionality of Section (F)(iii). The Ninth Circuit sanctioned such a procedure in Public Utility Commissioner of

---

9. We find that the other Organizational Plaintiffs—Arab–American Democratic Federation, Association of Arab American University Graduates, Irish National Caucus, Palestine Human Rights Campaign, American Friends Service Committee, League of United Latin American Citizens, Michel Bogopolsky, Darrel Meyers, and Southern California Interfaith Task Force on Central America—have not presented sufficient evidence to meet the three prongs of the Hunt test and consequently deny them standing.

*Oregon v. Bonneville Power Administration*, 767 F.2d 622, 630 (9th Cir.1985).

The Government contends that *Bonneville Power* is dispositive on the prudential considerations now before the Court. It argues that " 'where a statute commits review of final agency action to the court of appeals [even in the absence of an express statutory command of exclusiveness], *any suit* seeking relief that might affect the court's future jurisdiction is subject to its exclusive review,' " and a district court's jurisdiction under the general federal question statute (28 U.S.C. § 1331) is preempted. Gov't Memo. of Sept. 2, 1987, at 18–19 (emphasis in Gov't Memo.) (quoting *Bonneville Power*, 767 F.2d at 627). That case, however, dealt with plaintiffs involved in *ongoing* agency proceedings ultimately reviewable by the court of appeals. The Ninth Circuit held that these plaintiffs could not contest their ongoing proceedings in a district court because the court of appeals retained exclusive jurisdiction over the proceedings. *See also Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C.Cir.1984) (court of appeals has exclusive jurisdiction over claim that ongoing administrative proceeding is unreasonably delayed); *Air Line Pilots Ass'n Int'l v. CAB*, 750 F.2d 81 (D.C.Cir.1984) (same).

In the case at bar, the Other Six and the ADC are not engaged in any *ongoing* proceedings that would allow them to challenge the McCarran–Walter provisions or Section 901 of the FRAA; the Other Six's deportation proceedings are only for routine status violations. Thus, unlike Hamide and Shehadeh, the Other Six and the ADC do not have any administrative remedies to exhaust with respect to the McCarran–Walter provisions and Section 901 of the FRAA. They are not involved in any ongoing proceedings under the statutes at issue as were the plaintiffs in *Bonneville Power, Telecommunications Research & Action Center*, and *Air Line Pilots* and consequently do not have to forsake district court adjudication of their claims.

Contrary to the Government's argument, the fact that Hamide and Shehadeh are involved in ongoing deportation proceedings under Section (F)(iii) and can only seek review through the Ninth Circuit does not preclude a district court from granting the Other Six and the ADC pre-enforcement standing to challenge the McCarran–Walter provisions. Courts have not abstained from hearing a plaintiff's suit because another plaintiff's action was pending in another forum. *See, e.g., Steffel*, 415 U.S. at 459, 94 S.Ct. at 1215–16 (allowed pre-enforcement standing despite plaintiff's companion being prosecuted under the same statute); *Sable*, 827 F.2d at 644 (granted pre-enforcement standing where "the government has, in fact, prosecuted one of Sable's Los Angeles-based competitors"); *Polykoff*, 816 F.2d at 1331 (found pre-enforcement standing where the State "was actively prosecuting other owners of adult bookstores"). These cases reject the Government's theory that this Court, or for that matter any court in the United States, must desist from reviewing the McCarran–Walter provisions because of the fear of parallel tracks of litigation, inefficient use of resources, or conflicting decisions. Particularly with a First Amendment facial challenge, the type at issue here, abstention is inappropriate. *See J–R Distributors, Inc. v. Eikenberry*, 725 F.2d 482, 488 (9th Cir.1984) ("abstention by federal courts in first amendment cases could often result in the suppression of free speech that is meant to be protected by the Constitution"), *rev'd on the merits, Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). Comity principles also do not prevent this Court from hearing the claims of the Other Six and the ADC since these plaintiffs are not involved in ongoing proceedings under the provisions they seek to challenge. *See Steffel*, 415 U.S. at 462, 94 S.Ct. at 1217.

In an analogous case, *Sable Communications of California, supra*, the Ninth Circuit ruled that the district court erred when it abstained from analyzing the federal obscene telephone call statute, 47 U.S.C. § 223(b), even though the court of appeals had exclusive jurisdiction under 28 U.S.C. § 2342 to review the FCC's regulations made in accordance with the statute.

827 F.2d at 643. Similarly, in the instant case, we must not abstain from reviewing the constitutionality of the McCarran–Walter provisions and Section 901 of the FRAA even though the Ninth Circuit has exclusive jurisdiction to review Hamide and Shehadeh's final deportation orders.

Facing a real and immediate threat of deportation, but not an actual deportation, under the McCarran–Walter provisions and Section 901(b) of the FRAA, the Other Six and the ADC cannot bring their constitutional arguments before the Ninth Circuit. If this Court refused to rule on their claims, they would have no forum in which to challenge the constitutionality of these statutes. Because the threat of prosecution can be as effective as an actual prosecution, *see Dombrowski v. Pfister,* 380 U.S. at 486, 85 S.Ct. at 1120, the Government could effectively quell protected constitutional activity by threatening, but never instituting, deportation proceedings. The Other Six and the ADC would then be placed in the same untenable position as the plaintiff in *Steffel* where the Supreme Court stated:

> [A] refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting [the] law and the Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.

415 U.S. at 462, 94 S.Ct. at 1217. Like the "hapless plaintiff" in *Steffel,* the Other Six and the ADC do not face any proceedings under the challenged statutes, and they believe that they have a constitutional right to engage in the proscribed activity. Consequently, they are unjustifiably caught between "the Scylla of intentionally flouting the law and the Charybdis of foregoing what [they] believe to be constitutionally

protected activity in order to avoid becoming enmeshed in a [deportation proceeding]." [10] Having found that the ADC and each member of the Other Six have standing under Article III, we do not abstain from hearing their claims for prudential reasons. We now turn to the merits of their challenges.

## II. MERITS

### A. *Aliens' First Amendment Rights in the Deportation Context*

■ Before turning to the statutes at issue, we must address the Government's argument that aliens do not enjoy First Amendment rights in the deportation context. It has long been settled that aliens within the United States enjoy the protections of the First Amendment of the United States Constitution. *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953); *Bridges v. Wixon,* 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945); *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941); *United States v. Verdugo–Urquidez,* 856 F.2d 1214, 1222 (9th Cir.1988); *Parcham v. INS,* 769 F.2d 1001, 1004 (4th Cir.1985); *Massignani v. INS,* 438 F.2d 1276, 1278 (7th Cir.1971); *In re Weitzman,* 426 F.2d 439, 449 (8th Cir.1970) (Blackmun, J.); *Narenji v. Civiletti,* 481 F.Supp. 1132, 1139 n. 5 (D.D.C.), *rev'd on other grounds,* 617 F.2d 745 (D.C.Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

Recently, the Ninth Circuit in *Verdugo–Urquidez* relied on Justice Murphy's concurrence in *Bridges v. Wixon* and concluded that "aliens within the United States enjoy the benefits of the *first,* fifth, sixth and fourteenth amendments." 856 F.2d at 1222 (emphasis supplied). The Court of Appeals emphasized that "aliens within the

---

**10.** As counsel for the Government represented at the October 24, 1988 hearing, it could easily take four years before Hamide and Shehadeh have their cases reviewed by a federal court. Reporter's Transcript of October 24, 1988, at 29, lines 11–13. Even then their cases could be resolved in any number of ways without ad-

dressing the constitutional claims that the Other Six and the ADC seek to raise here. During this lengthy period of time, the chill on the First Amendment rights of the Other Six and the ADC members would be such that abstention is inappropriate.

United States" include nonimmigrant aliens as well as permanent resident aliens. *Id.*[11]

The Government concedes that aliens have First Amendment rights. Reporter's Transcript of April 27, 1987, at 10, lines 1–3. However, the Government argues that these First Amendment rights are drastically limited in the deportation context due to Congress' plenary power over immigration. To support this proposition, the Government relies on a long line of Supreme Court decisions beginning with a nineteenth century Chinese exclusion case, *Fong Yue Ting v. United States*, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893), through the 1950's cases, *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952), and *Galvan v. Press*, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), to the recent decisions in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), and *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). The Court does not dispute this line of precedent establishing Congress' authority over immigration and the limited judicial review employed in those cases. However, as will be discussed below, only one of the Government's cases, *Harisiades*, involved a First Amendment challenge in the deportation setting. In that case, the Supreme Court applied the same First Amendment standard applicable to citizens.

1. The Constitutional Limits of Congress' Plenary Authority in the Immigration Arena

At first glance, the Government's authorities indicate that Congress has virtually absolute and unchecked power over immigration matters. In *Fong Yue Ting*, 149 U.S. at 724, 13 S.Ct. at 1026, the Supreme Court stated: "[A]liens, having taken no steps towards becoming citizens, ... remain subject to the power of Congress to expel them, or to order them to be removed and deported from the country, whenever in its judgment their removal is necessary or expedient for the public interest." In *Carlson v. Landon*, 342 U.S. 524, 534, 72 S.Ct. 525, 531, 96 L.Ed. 547 (1952), the Court declared: "So long ... as aliens fail to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders." In *Galvan,* 347 U.S. at 531, 74 S.Ct. at 743, relied on in *Kleindienst*, 408 U.S. at 766–67, 92 S.Ct. at 2583–84, and *Fiallo*, 430 U.S. at 792–93 n. 4, 97 S.Ct. at 1478 n. 4, the Court opined: "[T]hat the formulation of [immigration] policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government."

Upon more careful reading, however, one can distill from these decisions the Supreme Court's recognition of the constitutional limitations to Congress' plenary immigration authority. The *Fong Yue Ting* Court elaborated that immigration power must be exercised "consistent[ly] with the Constitution" and the judiciary must intervene where "required by the paramount law of the Constitution." 149 U.S. at 712, 713, 13 S.Ct. at 1021, 1022. The *Carlson* Court observed that "[t]he power to expel aliens ... is, of course, subject to judicial intervention under the 'paramount law of the Constitution'" 342 U.S. at 537, 72 S.Ct. at 532 (quoting *Fong Yue Ting*). And in *Galvan*, the Supreme Court noted that

---

**11.** The *Verdugo–Urquidez* Court found support for this conclusion in the Supreme Court's decision in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) in which *illegal* aliens, i.e., aliens who could not establish that they had been legally admitted into the United States, were held to have rights under the Fourteenth Amendment. 856 F.2d at 1222. In *Plyler*, the Supreme Court rejected the argument that illegal aliens are not "persons within the jurisdiction" of the State of Texas, 457 U.S. at 210, 102 S.Ct. at 2391, and stated that "until he leaves the jurisdiction—either voluntarily, or involuntarily *in accordance with the Constitution and the laws of the United States*—[an illegal alien] is entitled to the equal protection of the laws that a State may choose to establish." 457 U.S. at 215, 102 S.Ct. at 2394 (emphasis supplied). Since none of the plaintiffs before the Court are here illegally, we do not reach the question of whether illegal aliens are protected by the First Amendment. Like the *Verdugo–Urquidez* Court, we simply draw no distinction between immigrant and nonimmigrant aliens for First Amendment purposes.

"since he is a 'person,' an alien has the same protection for his life, liberty and property under the Due Process Clause as is afforded to a citizen...." 347 U.S. at 530, 74 S.Ct. at 742. Thus, even conceding Congress' authority in the immigration arena, we are not relieved of our duty to ensure that Congress exercises its power within constitutional limits.

2. Government's Cases Not Involving First Amendment Challenges in the Deportation Setting

With the exception of *Harisiades*, the Government has not presented any case dealing squarely with an alien's First Amendment rights in the deportation context. Most of the cases involved Fifth Amendment due process challenges. *See Fong Yue Ting, supra* (Fifth Amendment due process challenge to an immigration law requiring deportation of Chinese laborers without certificates of residence); *Galvan, supra* (Fifth Amendment due process challenge to the Internal Security Act of 1950 providing for deportation of Communist Party members); *Mathews, supra* (Fifth Amendment due process attack on Social Security Act provisions granting eligibility for benefits to aliens under 65 years of age only if they have been admitted for permanent residence and have resided in the United States for five years); *Fiallo, supra* (Fifth Amendment due process challenge to Sections 101(b)(1), (b)(2) of the Immigration and Nationality Act denying preferential immigration status to illegitimate children and to fathers of illegitimate children); *see also Carlson, supra* (Fifth and Eighth Amendment challenge to provisions of the Internal Security Act of 1950 under which Communist Party members could be held in custody without bail).

In addition, several of the Government's "plenary power" cases centered on Congress' power to exclude aliens from our country's shores rather than its power to deport aliens lawfully residing in the country. Congress' power differs in the exclusion and deportation contexts. In the former, the government's decision to exclude an alien is all but conclusive on the courts, while in the latter an alien can look to the courts as a check on the government's power. The Supreme Court in *Kwong Hai Chew, supra*, elaborated on this distinction. Quoting Justice Murphy's concurrence in *Bridges v. Wixon*, 326 U.S. at 161, 65 S.Ct. at 1455 (Murphy, J., concurring), the Court stated: "The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country, he becomes invested with the rights guaranteed by the Constitution to all people within our borders." 344 U.S. at 596–97 n. 5, 73 S.Ct. at 477 n. 5; *see also Verdugo–Urquidez*, 856 F.2d at 1222 ("an alien seeking admission to the United States enjoys no constitutional rights") (citing *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979 (1904)).

Four of the Government's cases fall into the exclusion category. First, in *Turner, supra*, an alien excluded for being an anarchist challenged his exclusion on the ground that it violated the First Amendment. The Supreme Court denied his challenge, commenting that "those who are *excluded* cannot assert rights in general obtaining in a land to which they do not belong...." 194 U.S. at 292, 24 S.Ct. at 723 (emphasis supplied). Second, in *Kleindienst, supra*, United States citizens claimed that the government's exclusion of an alien violated the First Amendment. The Supreme Court ruled that "Mandel [a foreign journalist] personally, as an *unadmitted* and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise." 408 U.S. at 762, 92 S.Ct. at 2581 (emphasis supplied). Third, *Fiallo, supra*, involved a congressionally mandated exclusion that harmed citizens' interests. Reiterating language from *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909), the Supreme Court in *Fiallo* stated: " '[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the *admission* of aliens." 430 U.S. at 792, 97 S.Ct. at 1477 (emphasis supplied). Fourth, the

Ninth Circuit in *Adams v. Howerton*, 673 F.2d 1036 (9th Cir.), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982), faced the issue of whether Section 201 of the Immigration and Nationality Act of 1952, a preferential admissions standard based upon the existence of close family relationships, was unconstitutional as applied to the exclusion of one member of a homosexual couple. Upholding the law, the Ninth Circuit once again recognized Congress' broad exclusion powers, stating that "the power to *exclude* aliens is ... a power to be exercised exclusively by the political branches of government." 673 F.2d at 1041 (emphasis supplied).

In all four cases above, the focus of the Supreme Court's inquiry was on the existence, or more appropriately, the nonexistence of alien's rights in the face of Congress' power to exclude. None addressed the issue before the Court today: the First Amendment rights of aliens in the deportation setting.

3. Harisiades v. Shaughnessy

Decided in 1952, *Harisiades v. Shaughnessy, supra*, involved an attack on the provision in the Alien Registration Act of 1940 that authorized deportation of aliens based on their past Communist Party memberships. The aliens assailed this provision on three grounds: the Fifth Amendment Due Process Clause, the First Amendment freedom of speech and assembly, and the prohibition of passing an ex post facto law under Article I, § 9, clause 3 of the Constitution.

The Supreme Court rejected the aliens' Fifth Amendment substantive due process arguments that permanent residence confers a "vested right" on the alien, equal to that of a citizen, to remain within the country and that the Alien Registration Act

provision is unreasonably harsh. As it had done in previous cases, the Court deferred to the political branches in this area: "[Policies toward aliens] are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." 342 U.S. at 589, 72 S.Ct. at 519. The Government erroneously relies on language from *Harisiades'* Fifth Amendment discussion in support of its position that an alien's First Amendment rights are superceded in the deportation arena.

In addressing the aliens' First Amendment argument, the *Harisiades* Court dealt directly with the question of whether aliens have First Amendment rights in deportation matters. The Government, as in this case, urged the Court to find that the First Amendment does not apply "to the political decision of Congress to expel a class of aliens whom it deems undesirable residents." 96 L.Ed. at 593 (quoting Brief for the United States). The Court rejected this argument, ruling that it had the duty of distinguishing between aliens' constitutionally protected "advocacy of political methods" and their unprotected "methodical but prudent incitement to violence." 342 U.S. at 592, 72 S.Ct. at 520. To make this distinction, the Court explicitly employed the then prevailing First Amendment test from *Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). 342 U.S. at 592 n. 18, 72 S.Ct. at 520 n. 18. Although the Court found that the First Amendment did not prevent the resident aliens' deportation, the importance of its ruling for the instant case is that the Court applied the same First Amendment standard to aliens' claims that then applied to United States citizens' First Amendment challenges.[12]

---

12. The Government's attempt to distinguish *Harisiades* is unpersuasive. It merely posits that the Court's ruling was not clear on its face and that it only utilized the test applicable to the Communist Party rather than the prevailing First Amendment test. In light of the Government's brief in *Harisiades* urging the Court not to apply First Amendment principles in the deportation context, the Court's recognition of its duty to distinguish between mere advocacy and speech that incites violence, and the Court's

citation to *Dennis v. United States*, we must conclude that the Court found aliens in the deportation setting to have the same First Amendment rights as citizens. While several commentators have queried whether the Supreme Court correctly applied the *Dennis* test in *Harisiades, see* Legomsky, *Immigration and the Judiciary: Law and Politics in Britain and America* 202–05 (1987); Hesse, *The Constitutional Status of the Lawfully Admitted Permanent Resident Alien: The Inherent Limits of the Power to*

The *Harisiades* decision sets forth the proper analysis for examining constitutional challenges to deportation statutes. While the Court will defer to Congress's plenary immigration power in the substantive due process area, the Court will not accord Congress the same amount of deference in the First Amendment field. Had the *Harisiades* Court found that the Government's plenary immigration power required the same degree of judicial deference in *all* deportation challenges, it could have summarily dismissed the First Amendment attack in a sentence or two with a citation to its previous substantive due process discussion. Or the Court could have adopted *in toto* the language in Justice Frankfurter's concurrence that essentially abdicated all judicial responsibility for overseeing congressional actions in the deportation area. *Harisiades*, 342 U.S. at 596–98, 72 S.Ct. at 522–23 (Frankfurter, J., concurring). But the Court did not dismiss the First Amendment challenge in such a summary fashion. Instead, it addressed the aliens' First Amendment argument in a separate section and employed the *Dennis* test, the same First Amendment test then applicable to citizens. Thus, in the only case directly confronting aliens' First Amendment challenge to a deportation statute, the Supreme Court analyzed the aliens' claims in the same manner as if a citizen had brought the action.

4. Harisiades and the First Amendment

In *Harisiades*, the Supreme Court refused to recognize an alien-citizen distinction among speech and speakers in this country. This result accords with the "profound national commitment" reflected by the First Amendment that "debate on public issues [be] uninhibited, robust, and wide-open, and that it [include] vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964); *see also Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct.

1416, 1424–25, 89 L.Ed. 2013 (1945) (First Amendment designed to receive "the widest possible dissemination of information from diverse and antagonistic sources").

The First Amendment serves our national interests not only by preserving individual rights to speech but by ensuring that all speech from whatever source is protected. The maintenance of the "uninhibited marketplace of ideas," crucial for our democracy's prosperity, *see Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806–07, 23 L.Ed.2d 371 (1969), requires that each idea be afforded the same protection whether espoused by a citizen or an alien within this country. The Supreme Court affirmed this principle in the context of rejecting a different standard for a corporation's speech in *Pacific Gas & Electric v. California Public Utilities Commission*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality). The Court there stated that "[t]he constitutional guarantee of free speech 'serves significant societal interests' wholly apart from the speaker's interest in self-expression.... The identity of the speaker is not decisive in determining whether speech is protected." *Id.* at 8, 106 S.Ct. at 907 (quoting *First National Bank v. Bellotti*, 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978)). Aliens in this country, like corporations or individuals, "contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to further." *Id.* (quoting *Bellotti*, 435 U.S. at 783, 98 S.Ct. at 1419). Congress has acknowledged that "It is not in the interests of the United States to establish one standard of ideology for citizens and another for foreigners who wish to visit the United States." H.Conf.Rep. No. 100–475, 100th Cong., 1st Sess. 163, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2314, 2370, 2424. As Judge Learned Hand stated, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than

*Expel*, 69 Yale L.J. 262, 285 n. 153 (1959), we need not consider the Court's finding that the statute at issue survived First Amendment scrutiny. For our purposes, what is instructive is

that the Court chose to apply First Amendment principles in the face of an express Government argument that it need not do so.

through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943).

If corporate speech is protected for its contribution to vigorous public debate, then the speech of aliens must receive similar protection. For it defies reason and undermines the values underlying the First Amendment that a magazine article advocating doctrines of world communism or the unlawful damage, injury or destruction of property by the PFLP would be fully protected if published by a corporation or a citizen, but if authored or distributed by an alien could render the alien subject to the sanction of deportation.

5. No Different Bill of Rights for Aliens in the Deportation Setting

In the Government's view, a fundamentally "different" Bill of Rights applies to aliens seeking to avoid expulsion from the United States. The Government would have this Court rule that "in the limited context of deportation, the guarantees of the Bill of Rights are constitutionally irrelevant to the question of which non-citizens shall be permitted to remain within our borders." Gov't Supp. Memo. of May 19, 1987, at 27. To buttress this view, the

Government cites a litany of decisions in which courts have limited aliens' constitutional rights in the deportation setting.[13] From these cases the Government would have us conclude that while aliens have First Amendment rights generally, within the deportation forum these rights are "irrelevant" and can be severely circumscribed. We find that none of the Government's cases supports this broad and far-reaching proposition.

In determining that a particular constitutional provision did not apply in the deportation context, the courts did not rely on a "different" Bill of Rights for aliens; nor did they base their decisions on the Government's plenary immigration power. Rather, each decision was based upon the court's examination of the precedent interpreting the particular constitutional right at issue and upon its conclusion that the particular right had no application in the deportation setting. The results would be the same in analogous situations outside the immigration arena.

Many of the cases dismissed constitutional challenges on the ground that the right asserted was available only in *criminal* proceedings. Since deportation has always been held to be a civil proceeding, *see Lo-*

---

**13.** *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483–84, 82 L.Ed.2d 778 (1984) (Fourth Amendment based exclusionary rule); *Abel v. United States*, 362 U.S. 217, 233–34, 80 S.Ct. 683, 694–95, 4 L.Ed.2d 668 (1960) (arrests upon judicial warrant [an administrative order being sufficient] ); *Rodriguez–Gonzalez v. INS*, 640 F.2d 1139, 1141 (9th Cir.1981) (dismissal of proceedings resting upon constitutionally defective arrest); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 55–56, 68 L.Ed. 221 (1923) (Fifth Amendment privilege against self-incrimination); *INS v. Lopez–Mendoza*, 468 U.S. at 1043–44, 104 S.Ct. at 3485–86 (same); *Smith v. INS*, 585 F.2d 600, 602 (3d Cir.1978) (same); *Trias-Hernandez v. INS*, 528 F.2d 366, 368–69 (9th Cir.1975) (Fifth Amendment based right to *"Miranda"* warnings prior to custodial interrogation); *Bridges v. Wixon*, 144 F.2d 927, 936 (9th Cir.1944) (Fifth Amendment protection against double jeopardy), *rev'd on other grounds*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); *LeTourneur v. INS*, 538 F.2d 1368, 1370 (9th Cir.1976) (Fifth Amendment based right to adjudication by an independent judicial officer), *cert. denied*, 429 U.S. 1044, 97 S.Ct. 748, 50

L.Ed.2d 757 (1977); *United States v. Dekermenjian*, 508 F.2d 812, 814 (9th Cir.1974) (Fifth and Sixth Amendment based protection against in absentia adjudications); *Jay v. Boyd*, 351 U.S. 345, 357 n. 21, 360–61, 76 S.Ct. 919, 926 n. 21, 928–29, 100 L.Ed. 1242 (1956) (Fifth and Sixth Amendment based protection against discretionary adjudications based on undisclosed information); *Suciu v. INS*, 755 F.2d 127 (8th Cir.1985) (same); *Carlson v. Landon*, 342 U.S. 524, 537, 72 S.Ct. 525, 532–33, 96 L.Ed. 547 (1952) (Sixth Amendment trial by jury); *Ramirez v. INS*, 550 F.2d 560, 563 (9th Cir.1977) (Sixth Amendment right to counsel); *Lavoie v. INS*, 418 F.2d 732, 734 (9th Cir.1969) (Sixth Amendment based protection against interrogation in the absence of counsel), *cert. denied*, 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970); *Carlson v. Landon*, 342 U.S. at 544–56, 72 S.Ct. at 536–42 (Eighth Amendment protection against excessive bail); *Chabolla–Delgado v. INS*, 384 F.2d 360 (9th Cir. 1967) (Eighth Amendment based bar to expulsion as cruel and unusual punishment), *cert. denied*, 393 U.S. 865, 89 S.Ct. 147, 21 L.Ed.2d 133 (1968); *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954) (Article I, § 9 protection against ex post facto laws).

*pez–Mendoza,* 468 U.S. at 1038, 104 S.Ct. at 3483 ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry ..."), the alien could not make a successful challenge.[14] Citizens, too, are not entitled to these rights in the civil context.[15]

In other cases, the courts dismissed the constitutional challenge because deportation has never been held to constitute punishment.[16] *See Bugajewitz v. Adams,* 228 U.S. 585, 591, 33 S.Ct. 607, 608, 57 L.Ed. 978 (1913) (deportation is not "a punishment; it is simply a refusal by the Government to harbor persons whom it does not want"). Again, citizens do not enjoy these rights in a non-punitive setting.[17]

In the final group of decisions, although the courts did not reach their conclusions based upon the civil, non-punitive nature of a deportation proceeding, they nevertheless employed the same analysis that would apply were a citizen making a similar consti-

tutional challenge. For instance, in holding that an illegal arrest has no bearing on a subsequent deportation proceeding, the *Lopez–Mendoza* Court noted that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is *never* itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 468 U.S. at 1039, 1040, 104 S.Ct. at 3483, 3484 (emphasis supplied). *See also Rodriguez–Gonzalez v. INS,* 640 F.2d 1139, 1141 (9th Cir.1981) (same); *Medina–Sandoval v. INS,* 524 F.2d 658, 659 (9th Cir.1975) (same). Similarly, in determining that the Fourth Amendment based exclusionary rule does not apply to deportation proceedings, the *Lopez–Mendoza* Court employed the cost-benefit balancing test set forth in *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), a case involving a Fourth Amendment challenge outside the immigration area. Additionally, in holding that the

**14.** *See Bilokumsky,* 263 U.S. at 155, 44 S.Ct. at 56 ("since the [deportation] proceeding was not a criminal one," Fifth Amendment privilege of criminal defendant not to testify does not apply); *Lopez–Mendoza,* 468 U.S. at 1043–44, 104 S.Ct. at 3485–86 (same); *Smith,* 585 F.2d at 602 (same); *Trias–Hernandez,* 528 F.2d at 368–69 ("civil nature of deportation proceeding is significant" in court's determination that *Miranda* warning are not necessary prior to custodial interrogation); *Bridges,* 144 F.2d at 936 ("The principle of double jeopardy applies only to criminal proceedings"); *Ramirez,* 550 F.2d at 563 (in holding that Sixth Amendment's guarantee of the right to counsel is not applicable to deportation proceedings, court begins "by repeating once more that a deportation hearing is a proceeding that is civil, not criminal, in nature"); *Lavoie,* 418 F.2d at 734 (since "deportation proceedings are civil and not criminal, in nature," Sixth Amendment safeguards "requiring the presence of counsel during interrogation" are not applicable).

**15.** *See e.g., Roach v. N.T.S.B.,* 804 F.2d 1147, 1152–55 (10th Cir.1986) (no Fifth Amendment privilege not to testify in civil administrative investigation), *cert. denied,* —— U.S. ——, 108 S.Ct. 1732, 100 L.Ed.2d 195 (1988); *Williams v. U.S. Dept. of Transportation,* 781 F.2d 1573, 1578 n. 6 (11th Cir.1986) (*Miranda* warnings not required in non-custodial setting of administrative investigation; no Sixth Amendment right to counsel during interrogation in non-criminal setting); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 362–66, 104 S.Ct. 1099,

1104–05, 79 L.Ed.2d 361 (1984) (protection against Double Jeopardy does not apply in civil forfeiture proceedings); *Wolfolk v. Riviera,* 729 F.2d 1114, 1119–20 (7th Cir.1984) (no right to counsel in civil cases); *see also United States v. 5,644,540 in United States Currency,* 799 F.2d 1357, 1364 n. 8 (9th Cir.1986) (prohibition against ex post facto laws does not apply in civil forfeiture proceeding).

**16.** *Chabolla–Delgado,* 384 F.2d at 360 ("Deportation is not punishment within the meaning of the Eighth Amendment); *Galvan,* 347 U.S. at 531, 74 S.Ct. at 743 (Ex Post Facto Clause does not apply to deportation proceedings); *Harisiades,* 342 U.S. at 594–95, 72 S.Ct. at 521–22 (Ex Post Facto Clause does not apply to deportation because "deportation, while it may be burdensome and severe for the alien, is not a punishment").

**17.** *See e.g., Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (Eighth Amendment only applies to criminal punishment, not corporal punishment by school authorities); *Palermo v. Rorex,* 806 F.2d 1266, 1271 (8th Cir.1987) (Eighth Amendment Cruel and Unusual Punishment Clause applies only in criminal actions following conviction), *cert. denied,* —— U.S. ——, 108 S.Ct. 77, 98 L.Ed.2d 40 (1988); *Pace v. United States,* 585 F.Supp. 399, 402 (S.D.Tex.1984) (denial of Social Security benefits does not violate Cruel and Unusual Punishment Clause because denial does not constitute punishment).

Eighth Amendment bail clause did not prevent the denial of bail to an alien, the Supreme Court in *Carlson v. Landon*, 342 U.S. at 545, 72 S.Ct. at 537, noted that "[t]he Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country." *See also United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (upholding provisions of Bail Reform Act of 1984 allowing for the denial of bail in certain circumstances).

In *Harisiades*, the Supreme Court applied to aliens the same First Amendment test then applicable to citizens. The decisions cited by the Government and discussed above follow the *Harisiades* approach. Rather than supporting a "different" Bill of Rights for aliens in the deportation setting, these cases merely employed the same methods of constitutional adjudication available to citizens and concluded that the particular rights at issue had no application in the deportation area.

6. No Lower First Amendment Standard for Aliens in the Deportation Setting

Notwithstanding *Harisiades*, the Government urges us to adopt a lower First Amendment standard for aliens in the deportation arena. In support of this argument, the Government cites several decisions in which the Supreme Court has applied lower First Amendment scrutiny in limited contexts. For example, a prisoner retains only those First Amendment rights that are not "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Similarly, while students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), "[t]he undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Bethel*

*School Dist. No. 403 v. Fraser*, 478 U.S. 675, 681, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). The Supreme Court has also recognized that "[f]or the reasons which differentiate military society from civilian society, we think Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which the former shall be governed than it is when prescribing rules for the latter." *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974).

The Government argues from these decisions that "if school children and military personnel [and prisoners] may be restricted in the exercise of their First Amendment rights, it is hardly surprising that Congress can specify a ground for deportation which touches First Amendment concerns." Gov't Supp. Memo. of May 19, 1987, at 41. We disagree. In each of the above areas—prisons, schools, and the military—the Supreme Court adopted a lower First Amendment standard because of the significant governmental interest asserted. This lower standard of review applies, however, only when a plaintiff is present in the settings at issue. Thus, the prison standard applies only to inmates under prison authority; the school standard applies only while children are in school; and the military standard applies only to servicemen during their time in the military.

In none of these decisions does the lesser degree of First Amendment protection have any effect on the individual's constitutional rights *outside* the limited environment. The warden cannot prevent a prisoner from having an interview with the media once she has served her time; the school principal cannot punish students for using profanity during their summer vacations; and the military cannot court martial a doctor for speaking out against U.S. foreign policy once his military commitment is over.

By contrast, it is impossible to adopt for aliens a lower degree of First Amendment protection solely in the deportation setting without seriously affecting their First Amendment rights outside that setting.

Under a lower First Amendment standard, and without the constitutional protection against ex post facto laws, the Government could conceivably pass a law allowing for the deportation of aliens for statements made several decades earlier. An alien would have no way of knowing whether his or her speech would someday become a ground for deportation and consequently would be chilled from speaking at all.

Simply stated, the Government's view is that aliens are free to say whatever they wish but the Government maintains the ability to deport them for the content of their speech. To state the proposition is to reject it. As Justice Murphy wrote over forty years ago:

> Any other conclusion would make our constitutional safeguards transitory and discriminatory in nature. Thus the Government would be precluded from enjoining or imprisoning an alien for exercising his freedom of speech. But the Government at the same time would be free, from a constitutional standpoint, to deport him for exercising that very same freedom. The alien would be fully clothed with his constitutional rights when defending himself in a court of law, but he would be stripped of those rights when deportation officials encircle him.

*Bridges v. Wixon,* 326 U.S. at 162, 65 S.Ct. at 1456 (Murphy, J., concurring). Like Justice Murphy, we cannot agree that "the Constitution meant to make such an empty mockery of human freedom." *Id.* Since aliens enjoy full First Amendment protection outside the deportation setting, we decline to adopt a lesser First Amendment test for use within that setting.[18]

**B.** *Plaintiffs' First Amendment Challenge to the McCarran–Walter Provisions*

■ Plaintiffs challenge the McCarran–Walter provisions as being substantially overbroad in violation of the First Amendment. Having concluded that aliens have the same First Amendment rights as citizens, and that these rights are not limited in the deportation context, we now address that challenge.

The Supreme Court recently considered the overbreadth doctrine in *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987):

> The elements of First Amendment overbreadth analysis are familiar. Only a statute that is substantially overbroad may be invalidated on its face. *New York v. Ferber,* 458 U.S. 747, 769 [102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113] (1982); *Broadrick v. Oklahoma,* [413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973)]. "We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application...." *id.* at 630 [93 S.Ct. at 2925] (BRENNAN, J., dissenting). Instead, "[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 [102 S.Ct. 1186, 1191, 71 L.Ed.2d 362] (1982); *Kolender v. Lawson,* 461 U.S. 352, 359 n. 8 [103 S.Ct. 1855, 360 n. 8, 75 L.Ed.2d 903] (1983).

---

18. We do not dispute the Government's interests in preserving national security and promoting foreign policy in the exercise of its immigration power. These interests are adequately protected, however, by the prevailing First Amendment standard allowing for the deportation of individuals who advocate imminent lawless action and whose speech is likely to induce such action. *See Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). The Government could also deport aliens, without violating the First Amendment, for their affiliation with an organization, if it established that that group affilition posed a legitimate threat to the government. *See Healy v. James,* 408 U.S. 169, 186, 92 S.Ct. 2338, 2348, 33 L.Ed. 2d 266 (1972); *United States v. Robel,* 389 U.S. 258, 265–66, 88 S.Ct. 419, 424–25, 19 L.Ed.2d 508 (1967). In addition, as long as the Government narrowly tailors its deportation laws to further its compelling interests in foreign policy and national security, it can enact laws, (*e.g.,* espionage or national secrecy laws), that allow for the deportation of aliens on the basis of their First Amendment activities. Thus, there is no basis for a lower standard of First Amendment protection for aliens.

The rationale for the doctrine was stated in *NAACP v. Button,* 371 U.S. at 433, 83 S.Ct. at 338 (citations omitted): "[First Amendment] freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions ... Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."

Under *Hill,* we examine whether the McCarran–Walter provisions reach a "substantial amount of constitutionally protected conduct," by failing to make a distinction between lawful behavior and the more narrow scope of impermissible conduct not protected by the Constitution. In *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the Supreme Court considered what type of limits the government could place on First Amendment activities. Interpreting the Smith Act of 1940, the Court held that to be constitutional, the statute could only apply to "advocacy of *action* for the overthrow of government by force and violence." *Yates,* 354 U.S. at 324, 77 S.Ct. at 1079–80 (emphasis supplied). The Court distinguished advocacy of action from advocacy of belief, stating that "[t]he essential distinction is that those to whom the advocacy is addressed must be urged to *do* something, now and not in the future, rather than merely *believe* in something." *Id.* at 324–25, 77 S.Ct. 1079–80 (emphasis in original).

Over a decade later in *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Supreme Court articulated the standard governing what constitutes permissible and impermissible conduct in the area of speech advocating unlawful action. Consistent with the First Amendment, the government may only prohibit advocacy "directed to inciting or producing imminent lawless action and ... likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829. The Court has repeatedly emphasized that the incitement must be to imminent lawless action. *See, e.g., Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973) (conviction for disorderly conduct during campus protest reversed where statements "amounted to nothing more than advocacy of illegal action at some future time").

Like the Supreme Court in *Harisiades,* we review the deportation statute employing the prevailing First Amendment standard. Under this standard, the *Brandenburg* test, the McCarran–Walter provisions are substantially overbroad. Section 241(a)(6)(G)(v) ("Section (G)(v)") allows for the deportation of aliens who write, publish, or knowingly circulate, distribute, print, display, or possess any material advocating or teaching opposition to all organized government, the economic, international, and governmental doctrines of world communism, or the establishment in the United States of a totalitarian dictatorship. Section 241(a)(6)(H) ("Section (H)") allows for the deportation of aliens who are members of or affiliated with any organization that engages in the proscribed activities in Section (G). These provisions proscribe almost exclusively activity protected by the First Amendment. Simply writing, publishing circulating, distributing, printing, displaying, and possessing material advocating or teaching the prohibited ideologies cannot be equated with advocacy of imminent unlawful action. As stated in *Noto v. United States,* 367 U.S. 290, 297–98, 81 S.Ct. 1517, 1520–21, 6 L.Ed.2d 836 (1961), "the mere abstract teaching of Communist theory, including the teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action."

The other McCarran–Walter provisions are even more substantially overbroad than Sections (G)(v) and (H). Section 241(a)(6)(D) ("Section (D)") allows for the deportation of aliens who "advocate the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, or who are members of or affiliated with any organization" that so advocates, "either through its own utterances or through any written or printed publications issued or published by or with the permission or consent of or under the authority of such organization...." Sec-

tion (F)(iii) allows the deportation of "[a]liens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches ... the unlawful damage, injury or destruction of property."

While Sections (G)(v) and (H) deal with advocacy and affiliation through the printed medium, Sections (D) and (F)(iii) proscribe advocacy and affiliation more generally. Like Sections (G)(v) and (H), though, Sections (D) and (F)(iii) do not differentiate between constitutionally permissible and impermissible activities. These provisions could as easily be applied to prohibit an alien from wearing a PFLP button, attending a PFLP lecture, distributing a PFLP newspaper, or teaching a PFLP viewpoint as they could be employed to prevent advocacy of imminent lawless action.

It takes no searching inquiry to conclude that, judged according to the prevailing *Brandenburg* test, the challenged provisions cannot pass constitutional muster. Accordingly, we hold that the McCarran–Walter provisions are substantially overbroad and violate the First Amendment.[19]

### CONCLUSION

In sum, we hold that aliens who are legally within the United States are protected by the First Amendment and that their First Amendment rights are not limited by the Government's plenary immigration power. Applying established First Amendment principles, we further hold that the McCarran–Walter provisions are substantially overbroad in contravention of the First Amendment.

IT IS SO ORDERED.

---

**19.** Plaintiffs have also asked this Court to address the constitutionality of Sections 901(a) and 901(b) of the FRAA. The former is challenged by immigrant aliens who claim that the denial of Section 901(a) protection to them violates the equal protection component of the Fifth Amendment Due Process Clause. The latter, specifically the PLO Exception, is challenged by nonimmigrant aliens also on Fifth Amendment grounds. Although we did address this latter challenge in our ruling in court on December 22, 1988, at that time we did not reach the question of whether nonimmigrant aliens were entitled to First Amendment protection. Since we now find that the First Amendment protects *all* aliens, it is no longer necessary to consider the constitutionality of Section 901 of the FRAA.