AMERICAN–ARAB ANTI–DISCRIMINATION COMMITTEE, et al., Plaintiffs,

v.

Janet RENO, in her capacity as Attorney General of the United States, et al., Defendants.

No. CV 87–2107–SVW(Kx).

United States District Court, C.D. California.

Jan. 24, 1995.

Paul L. Hoffman, Mark D. Rosenbaum, Carol A. Sobel, ACLU Foundation of Southern California, Los Angeles, CA, David Cole, Counsel, Center for Constitutional Rights, Georgetown University Law Center, Washington, DC, Dan Stormer, Nat. Lawyers Guild, Pasadena, CA, Marc Van Der Hout, Nat. Lawyers Guild, San Francisco, CA, Kate Martin, ACLU Foundation, Washington, DC, Peter Schey, Center for Human Rights Constitutional Law, Los Angeles, CA, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., George J. Phillips, Acting Deputy Asst. Atty. Gen., Nora Manella, U.S. Atty., Lee Weidman, Asst. U.S. Atty., Chief, Civ. Div., Michael C. Johnson, Asst. U.S. Atty., Los Angeles, CA, Robert L. Bombaugh, Director, Lauri Steven Filppu, Deputy Director, Michael P. Lindemann, James A. Hunolt, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

WILSON, District Judge.

### I. Background

In June of 1987, plaintiffs Aiad Barakat and Naim Sharif applied for legalization under the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1255a ("IRCA"). Legalization under IRCA is a two-step process. First, the Attorney General grants temporary resident status to any alien who establishes: (1) that he has maintained a continuous, unlawful residence in the United States from a date prior to January 1, 1982; (2) that he is admissible as an immigrant; and (3) that he has not been convicted of a felony or more than two misdemeanors committed in the United States. 8 U.S.C. § 1255a(a). Second, the Attorney General grants permanent resident status to any alien granted temporary resident status who resides here continuously for eighteen months and meets certain literacy requirements. 8 U.S.C. § 1255a(b).

Although plaintiffs filed their applications in 1987, the Immigration and Naturalization Service ("INS") did not adjudicate those applications until March 1991. At the time plaintiffs applied for legalization, INS regulations required all issues of statutory eligibility for immigration benefits, including legalization, to be determined solely on the basis of information in the record disclosed to the applicant. 8 C.F.R. § 103.2(b)(3)(ii) (1990).

On January 7, 1991, the INS amended the rules regarding confidential information. 56 Fed.Reg. 618–24 (Jan. 7, 1991). While the prior rule had allowed the INS to rely on undisclosed, classified information only for discretionary determinations such as exclusion and withholding of deportation, the new regulations additionally allow reliance on such information for nondiscretionary immigration benefits such as legalization. 8 C.F.R. § 103.2(b)(3)(ii), (iv) (1994) (as amended).

When the INS finally issued Notices of Intent to Deny to the plaintiffs, it relied in part on these new regulations. The Notices stated that the INS had classified information indicating that the plaintiffs are members of the Popular Front for the Liberation of Palestine ("PFLP"). The PFLP, the Notices went on to state, is an organization that advocates doctrines disapproved under 8 U.S.C. § 1182(a)(28)(F).[1] The Notices do not identify any evidence supporting the allegations regarding the plaintiffs' connection with the PFLP. Instead, they state that "classified information" supports these charges and that the INS will not disclose the information to the plaintiffs because "its protection from unauthorized disclosure is required in the interests of national security, as provided in 8 C.F.R. § 103.2(b)(3)(iv)." The Notices conclude by stating that unless the plaintiffs can

disprove the INS's charges (the evidence of which remains confidential), the INS will deny their applications. If the applications are denied, Barakat and Sharif will be ineligible for temporary resident status—the first step in the legalization process. In addition, they will lose their right to work in this country. *See* Defendants' First Response to the Discovery Order of January 7, 1994, Relating to Legalization at 1–2. The next step in the application process will be for the INS to hold a hearing giving Barakat and Sharif an opportunity to rebut the Government's allegations of PFLP membership. The Government contends that it does not need to reveal the classified information to the plaintiffs at that hearing.

Barakat and Sharif have moved for a permanent injunction enjoining the INS from using confidential information in adjudicating their IRCA applications. Plaintiffs present five arguments regarding the INS's use of undisclosed, classified information. First, they argue that 8 C.F.R. § 103.2 should not be applied retroactively because it would cause manifest injustice and alter plaintiffs' substantive rights. Second, they maintain that defendants' use of classified information denies them due process because it deprives plaintiffs of a meaningful opportunity to confront the Government's evidence.[2] Third,

---

1. The Court notes that 8 U.S.C. § 1182(a)(28)(F) has been repealed and replaced with new definitions of categories of excludable aliens. Plaintiffs are subject to the old version because it was the law when they initially applied for legalization. The old version of the code classifies as excludable:

 Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches (i) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally) of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage....

 8 U.S.C. § 1182(a)(28)(F), *amended by* Pub.L. No. 101–649, § 601(a), 104 Stat. 4978 (1990). The INS has charged the plaintiffs with violating all four subparts of § 1182(a)(28)(F). *See* Defendants' Memorandum Concerning Statutory Pro-

visions Employed in Legalization Proceedings, Pursuant to the Court's April 20, 1994, Order.

 The Court further notes that this law was declared unconstitutional in *Rafeedie v. INS*, 795 F.Supp. 13 (D.D.C.1992) (*"Rafeedie III"*). The INS did not appeal that decision. This Court is foreclosed from deciding whether the law is unconstitutional as applied in the present case because the issue is not ripe. *See infra* part II. If the issue of the constitutionality of the law were to reach the Ninth Circuit, it might have to confront the question whether *Rafeedie III* precludes the INS from applying § 1182(a)(28)(F) in this circuit. *Compare H.L. v. Matheson*, 450 U.S. 398, 406, 101 S.Ct. 1164, 1169–70, 67 L.Ed.2d 388 (1981) (unappealed district court ruling binding on state party) *with United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (non-mutual offensive collateral estoppel not available against federal government).

2. The Court has previously granted a preliminary injunction enjoining the government from using classified information in considering and adjudicating the applications of Barakat and Sharif

they maintain that such use violates the First Amendment, which they state requires heightened procedural safeguards where government officials review speech and associational activities. Fourth, they argue that the INS waived its right to invoke 8 U.S.C. § 1182(a)(28)(F)(iii) when it represented to the Ninth Circuit that it would not enforce a similar provision against these plaintiffs. Finally, they make a constitutional attack on § 1182(a)(28)(F), arguing that it violates the First Amendment on its face because it penalizes constitutionally protected associations.

## II. Justiciability

The Court has previously determined that it has jurisdiction over the due process claim. *See* Order filed August 13, 1993. In the interim an important Ninth Circuit case has been decided. *Naranjo–Aguilera v. INS*, 30 F.3d 1106 (9th Cir.1994). The *Naranjo–Aguilera* decision clarifies the United States Supreme Court decisions on District Court jurisdiction over claims under IRCA.

> Two clear propositions emerge from [*Reno v. Catholic Social Servs., Inc.*, —— U.S. ——, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("*CSS*") ] and [*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) ]. First, district courts have jurisdiction over "collateral," "procedural" challenges to INS practices in the processing of applications, such as the front-desking in *CSS* or the denial of interpreters in *McNary*. In such cases, [IRCA's] limited review scheme would be incapable of generating an administrative record adequate for effective judicial review. . . .
>
> Second, however, the "neat dovetailing" of ripeness doctrine and IRCA's exclusive review provisions, see *CSS*, [—— U.S. at ——] 113 S.Ct. at 2497, forecloses aliens from challenging INS regulations or policies interpreting IRCA's substantive eligi-

bility criteria, except on appeal from an order of deportation.

*Id.* at 1112–13.

■ *Naranjo–Aguilera*, *McNary*, and *CSS* therefore support the Court's holding in the August 13, 1993 Order. Plaintiffs raising purely legal claims must appeal the INS denial through the channels provided in IRCA; plaintiffs raising procedural claims requiring extensive fact-finding and record developing may raise their claims in federal District Court.

■ In the case at hand, plaintiffs raise both types of claims. The retroactivity argument, the judicial estoppel argument and the facial attack on 8 U.S.C. § 1182(a)(28)(F) are purely legal claims. According to the Supreme Court's analysis in *CSS*, then, these claims are not yet ripe for review. If the INS denies the plaintiffs' applications, the claims will become ripe and the IRCA review provisions will come into effect. Plaintiffs may obtain review at the appellate level.

■ In contrast, plaintiffs' procedural due process and First Amendment claims are ripe for review. Like the " '17 unsuccessful individual SAW applicants' in *McNary*," *CSS*, —— U.S. at ——, 113 S.Ct. at 2497, the plaintiffs in the case at hand will not be able to obtain meaningful review of their procedural claims because the appellate court will not have the fact-finding capabilities necessary to evaluate such claims.

■ Plaintiffs urge the Court to reconsider its ruling that it does not have jurisdiction over the retroactivity issue. The Court has thoroughly considered the issue, and has determined that the retroactivity question can be addressed by the Court of Appeals, if necessary, without the aid of District Court fact-finding. It is true that the "manifest injustice" standard, *Chenault v. United States Postal Service*, 37 F.3d 535 (9th Cir. 1994) requires examination on a case-by-case basis of the nature of the rights and parties affected by a change in law, and the general equities of applying the changed law to the

unless the Government provides them with the classified information. See Order filed January 9, 1994. The preliminary injunction was premised in part on the government's refusal to re-

veal, even *in camera*, its evidence. The Government has since revealed the evidence to the Court *in camera*.

particular case at hand. *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Delta Computer v. Samsung Semiconductor*, 879 F.2d 662, 63–64 (9th Cir.1989). Nevertheless, the Court does not believe that detailed fact-finding would be necessary to evaluate the nature of the rights and parties affected, nor the general equities at issue here. Plaintiffs suggest that it would be fruitful to depose people at the INS to determine why the INS waited so long to address plaintiffs' legalization actions. The Court agrees that development of those facts might be slightly relevant to the retroactivity question. But the fact that discovery would be helpful on one small issue is not enough to change the overall nature of the retroactivity analysis. As a whole, the retroactivity question is one of law, and it can be handled by the Court of Appeal. The Court holds that *CSS* did not contemplate District Court review of retroactivity questions.

In contrast, evaluation of the due process question has entailed the development of a substantial record. In particular, the Court has developed facts regarding 1) the importance to the plaintiffs of their immigration applications, 2) the risk that the plaintiffs will be erroneously deprived of temporary resident or other legalized status, 3) the likelihood that allowing access to the classified information would reduce the risk of an erroneous deprivation, and 4) the Government's interest in keeping certain information confidential because of national security concerns, together with the Government's interest in denying legalization to people who are members of groups such as the PFLP. The record consists of a multitude of documents including: (1) testimony from plaintiffs in the form of declarations; *see* Declarations of Barakat and Sharif; (2) discovery responses from the Government; *see* Defendants' First Response to the Discovery Order of January 7, 1994, Relating to Legalization; Defendants' Memorandum Concerning Statutory Provisions Employed in Legalization Proceedings, Pursuant to the Court's April 20, 1994, Order; Defendants' Supplemental Discovery Response Pursuant to the Court's June 29, 1994, Order; and (3), most importantly, the Government's *in camera* submission.

Due to the completely different nature of the fact-finding necessary to evaluate the claims, the Court holds that it does have jurisdiction over the procedural due process and First Amendment claims, but not over the retroactivity and judicial estoppel claims, nor over the facial attack.

## III. Due Process

The Court must now consider the merits of the claims that the procedural due process rights of Barakat and Sharif have been and will be violated by the Government's use of classified information—that plaintiffs have not been and will not be allowed to see—in the adjudication of plaintiffs' applications for legalization.

■ The INS contends that no process is due, relying first on the 'assimilation' doctrine. Under this doctrine, "[a]n alien seeking to adjust his status to that of a permanent resident is assimilated to the position of an alien seeking to enter the United States for permanent residence." *Campos v. INS*, 402 F.2d 758, 760 (9th Cir.1968). Because the IRCA provisions governing adjustment of status incorporate admissibility requirements, the INS would have this Court treat plaintiffs as if they had just arrived at the border and were asking for entry into the country. In essence, they argue that legalization proceedings are no different than exclusion proceedings. It is settled that in exclusion proceedings any process that Congress provides is sufficient to satisfy the constitutional demands. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950). *See also Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.") (quoting *Bridges v. Wixon*, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945) (Murphy, J., concurring)).

■ More recent authority, however, compels the conclusion that the 'assimilation' doctrine does not apply in IRCA legalization

cases. Notably, in *Haitian Refugee Ctr., Inc. v. Nelson,* 872 F.2d 1555, 1562 (11th Cir.1989), *aff'd, McNary,* 498 U.S. 479, 111 S.Ct. 888, the court was faced with a due process challenge to the Special Agricultural Worker program, an IRCA legalization program very similar to the program at issue in this case. The court held that due process attaches to the right to apply for legalization, and that the *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), balancing test was to be used to determine whether the INS's procedures were proper. *Haitian Refugee Center,* 872 F.2d at 1562.

■ Under the INS's assimilation theory, plaintiffs in *Haitian Refugee Center* and *McNary* would have been entitled to little or no due process. However, in affirming *Haitian Refugee Center,* the Supreme Court noted that "[e]ven disregarding the risk of deportation, the impact of a denial on the opportunity to obtain gainful employment is plainly sufficient to mandate constitutionally fair procedures in the application process." *McNary,* 498 U.S. at 491, 111 S.Ct. at 895. Constitutionally fair procedures are more than the minimal process afforded to participants in exclusion proceedings.

Moreover, subsequent to *Campos,* the Ninth Circuit has pointed out that:

> Assimilation to the position of an applicant for entry refers to the application of eligibility criteria for admission and to differences in burden of proof. It does not mean necessarily tha[t] an alien within the country after an entry must assume a position indistinguishable from an alien seeking initial entry.

*Firestone v. Howerton,* 671 F.2d 317, 320 n. 5 (9th Cir.1982). Based on these cases, the critical constitutional distinction is not whether the alien is applying for an immigration benefit that requires a showing of admissibility, but simply whether the alien has entered the United States. Thus, under *Firestone* and the facts and reasoning of *Haitian Refugee Center* and *McNary,* this Court is foreclosed from accepting the Government's *Campos*-based argument and holding that plaintiffs are to be assimilated to the position of an alien seeking to enter the United States.

■ This analysis comports with Supreme Court decisions discussing the difference between deportable and excludable aliens. The various due process immigration cases have consistently stated that aliens must be given substantially fair procedures in immigration hearings, so long as the aliens have entered the United States. For example, in *Landon v. Plasencia,* the Supreme Court noted that an alien seeking initial admission to the country has no constitutional rights, but recognized that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). And in *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953), the Supreme Court stated: "It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."[3] Since Barakat and Sharif have lived in this country for over twelve years, they are entitled to fair constitutional procedures.[4]

**3.** *Accord Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality."); *Sale v. Haitian Ctrs. Council, Inc.,* 113 S.Ct. 2549, 2560, 125 L.Ed.2d 128 (1993) (quoting *Mezei* with approval).

**4.** *See also Hiroshi Motomura, Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation,* 100 *Yale L.J.* 545, 557 (1990) (discussing the

statutory background) ("If an alien seeks entry, the admission and exclusion rules apply; after entry, deportation rules apply."); *id.* at 554–60 (discussing Supreme Court cases); *Peter H. Schuck & Theodore H. Wang, Continuity and Change: Patterns of Immigration Litigation in the Courts,* 45 *Stan.L.Rev.* 115, 121 (1992) (citing *Plasencia*) ("An alien is 'deportable' if she is within U.S. borders, whether legally or illegally, while an alien who has not yet entered the country, or who has entered only under an INS-granted 'parole,' is considered 'excludable' and receives more limited protections."). *See gener-*

The Court can find only two categories of cases where aliens who have previously entered the United States are treated as excludable and given very little process. Neither category is analogous to the present case. The first category involves aliens who leave the United States for a substantial period of time, and who are treated as excludable upon return to the country. This line of cases springs from *Mezei*, 345 U.S. at 206, 73 S.Ct. at 625.[5] Mezei, an alien immigrant, lawfully lived in the United States from 1923–1948, and then left to visit his dying mother in Hungary. He returned to this country with a visa issued by the American Consul in Budapest, but was denied entry on the "basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest." 345 U.S. at 208, 73 S.Ct. at 627. The Supreme Court treated Mezei as an alien on the threshold of initial entry despite the fact that he had lived in this country for 25 years. Thus, for Mezei, any process conferred by Congress was due process.

The second category of cases treating aliens who have entered the United States as excludable involves aliens who are caught attempting to enter the United States, and who are allowed to enter the United States on parole. In *Leng May Ma*, 357 U.S. at 185, 78 S.Ct. at 1072, the Court faced the question of whether an alien who was considered excludable but had been paroled into this country was 'within' the United States under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), and thus entitled to seek withholding of deportation under that section. The Court first noted the distinction between excludable aliens and those aliens who have already entered the country. The Court then discussed cases holding that aliens held in custody pending a determination of their admissibility have not made "an entry though the alien is physically within the United States. It seems quite clear that an alien so confined would not be 'within the United States' for purposes of § 243(h)." 357 U.S. at 188, 78 S.Ct. at 1074 (citations omitted). Relying on the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5), the Court concluded that aliens on parole were to be treated the same as aliens in custody. Thus, despite the fact that the alien had lived in the United States for several years, the court treated her as if she were excludable.

 Barakat and Sharif's status is not analogous to that of excludable aliens under either line of cases. They have lived in the United States continuously for over twelve years. They do not fit into the first category because they have not left and then returned to the country. They do not fit into the second category because they entered the country legally, and were never paroled. Rather, their presence in the United States entitles them to the protections of the Due Process Clause.[6]

As much as the INS would like to characterize this case as an exclusion proceeding, it is neither an exclusion proceeding nor a deportation proceeding. Rather, it is a case of the INS refusing to confer a statutory benefit (temporary resident status) on plaintiffs. Since these facts do not fit precisely within any established precedent, the Court cannot rely on either deportation or exclusion cases to determine the constitutional sufficiency of the procedures used by the INS.

 The Supreme Court has made it clear that due process is flexible. *E.g.*, *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12–13, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979). Courts use the *Mathews v. Eldridge*, 424

---

ally Hiroshi Motomura, *The Curious Evolution of Immigration Law: Procedural Surrogates for Substantive Constitutional Rights*, 92 *Colum.L.Rev.* 1625, 1650–56 (1992) (discussing *Plasencia*, and the 'due process revolution').

5. *Cf. Kwong Hai Chew*, 344 U.S. at 590, 73 S.Ct. at 472 (reasoning that a resident alien returning from a brief trip has a right to due process).

6. The Court notes that at least for Due Process purposes, there is no distinction between illegal aliens and aliens whose presence in the country is lawful. The Due Process Clause protects all persons living in this country, whether citizen or alien. *See Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.").

U.S. at 395, 96 S.Ct. at 903, framework to determine the constitutional sufficiency of procedures in immigration law cases. *See Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330 (applying *Mathews* to immigration procedures). *Accord Rafeedie v. INS,* 880 F.2d 506, 523 (D.C.Cir.1989) (*"Rafeedie II "*) (applying *Mathews* under circumstances analogous to the present case). Thus, the Court holds that the *Mathews v. Eldridge* test must be used to determine the constitutional sufficiency of the procedures used by the INS.

■ *Mathews* provides three factors for determining whether an administrative procedure satisfies due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. Given the facts of this dispute, the Court holds that the relevant considerations include:

(1) the importance to the plaintiffs of their immigration applications;

(2) the risk that the plaintiffs will be erroneously deprived of temporary resident or other legalized status because they cannot confront the evidence against them, together with the likelihood that allowing access to the classified information (or perhaps some proxy summary of the classified information) will reduce the risk of an erroneous determination of their applications; and

(3) the Government's interest in keeping certain information confidential because of national security concerns, together with the Government's interest in denying legalization to people who are members of groups that advocate doctrines disapproved in 8 U.S.C. § 1182(a)(28)(F).[7]

The merits question requires consideration of the *Mathews v. Eldridge* factors in light of two sets of cases. In the first set of cases, courts, including the Supreme Court, have held that the INS may use classified information without disclosing it to applicants seeking discretionary relief. *Jay v. Boyd,* 351 U.S. 345, 358–60, 76 S.Ct. 919, 927–28, 100 L.Ed. 1242 (1956) (emphasizing "gratuitous" nature of relief sought, i.e., suspension of deportation); *Suciu v. INS,* 755 F.2d 127, 128 (8th Cir.1985) (per curiam) (*Jay* precludes petitioner seeking discretionary relief from deportation from claiming that consideration of classified material violates due process rights) (noting in dicta that, if not for *Jay,* petitioner's argument would have substantial appeal as a matter of fairness and logic).

■ The Court holds that *Jay* is binding only on parties seeking discretionary relief. *Naji v. Nelson,* 113 F.R.D. 548, 551–552 (N.D.Ill.1986) (*Jay* distinguished as applying only to discretionary matters) (discovery authorized regarding propriety of Government's use of confidential information in adjudicating Naji's rights to statutory benefits); *Rafeedie v. INS,* 688 F.Supp. 729, 750 n. 50 (D.D.C.1988) (*"Rafeedie I "*) (*Jay* limited to situations where party seeking discretionary relief), *aff'd in relevant part,* 880 F.2d 506, 519 (D.C.Cir.1989) (affirming preliminary injunction). *See also United States ex rel. Barbour v. District Director of INS,* 491 F.2d 573, 578 (5th Cir.) (*Jay* authorizes use

---

7. The Court notes that the constitutionality of § 1182(a)(28)(F) is questionable. This Court previously declared unconstitutional deportation provisions with language identical to subsection (F)(iii) but was overturned by the Ninth Circuit on ripeness grounds. *American–Arab Anti–Discrimination Committee v. Meese,* 714 F.Supp. 1060 (C.D.Cal.1989), *rev'd in relevant part, American–Arab Anti–Discrimination Committee v. Thornburgh,* 970 F.2d 501 (9th Cir.1991). The Court's decision in *Meese* was cited with apparent approval in *Price v. United States,* 962 F.2d 836, 843 n. 7 (9th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 683, 126 L.Ed.2d 650 (1994). However, for purposes of this decision, the Court must assume that the section is constitutional, because it does not have jurisdiction to reach the constitutionality of the statute. *See supra* part II. Thus, the Court assumes *arguendo* that the government has some interest in denying legalization to persons who are members of groups that advocate doctrines disapproved under the statute.

of confidential information in discretionary immigration proceedings, such as release on bail), *cert. denied,* 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).

Plaintiffs seek nondiscretionary relief in this case. Under IRCA, "[t]he Attorney General *shall* adjust the status of an alien to that of an alien lawfully admitted for temporary residence if the alien meets the [statutory requirements]." 8 U.S.C. § 1255a(a) (emphasis added). Unlike exclusion or suspension of deportation cases where the INS may use its discretion, in IRCA legalization cases the INS must adjust an alien's status so long as the requirements set by Congress are met. Thus, the holding in *Jay* does not bind this Court.[8]

The second set of cases relates to the *Rafeedie* litigation in the District of Columbia. *Rafeedie I,* 688 F.Supp. at 729; *Rafeedie II,* 880 F.2d at 506; *Rafeedie III,* 795 F.Supp. at 13. In this series of cases, the District Court and the Court of Appeals for the District of Columbia considered the INS's use of confidential information in exclusion proceedings against a permanent resident alien whom the Government alleged was a member of the PFLP. In *Rafeedie I,* the District Court granted a preliminary injunction against the INS's use of a summary exclusion proceeding including the use of undisclosed confidential information. *Rafeedie I,* 688 F.Supp. at 755. In *Rafeedie II,* the D.C. Circuit affirmed the preliminary injunction and held that the *Mathews v. Eldridge* test applied to the Government's regulation allowing confidential information to be used. *Rafeedie II,* 880 F.2d at 519, 524. In *Rafeedie III,* the District Court applied the *Mathews v. Eldridge* test and determined that to the extent that the Government had already

used confidential information against Rafeedie, Rafeedie's due process rights had been violated. *Rafeedie III,* 795 F.Supp. at 18–20. On the other hand, the District Court concluded that it could not invalidate the regulation authorizing the use of the summary proceeding because the Government might voluntarily provide a more extensive hearing. *Id.* at 20–21.

In light of these two sets of cases and the facts of the present case, this Court now examines the *Mathews v. Eldridge* factors.

The INS concedes that Barakat and Sharif have a substantial interest at stake because they seek the right to remain legally in this country. The Court finds that Barakat and Sharif's liberty interests are substantial. Both have lived in this country for more than 12 years, and have extensive community ties. Sharif's mother, father, brother, sister-in-law, two nieces, and several cousins all live in the United States. Barakat lives with his wife and son. His brother and sister-in-law and several cousins also live here. If plaintiffs are denied legalization, they will lose their right to work, and they will be subject to deportation laws. *See* Defendants' First Response to the Discovery Order of January 7, 1994, Relating to Legalization at 1–2. Thus, denial of legalization would impose great hardship on plaintiffs, and the first *Mathews* factor tilts heavily in their favor.

In addition, there is a high risk that the plaintiffs will be erroneously deprived of temporary resident or other legalized status because they cannot confront the evidence to be used against them. One would be hard pressed to design a procedure more likely to result in erroneous deprivations. As Justice

---

8. It could be argued that as a whole, the IRCA program is "gratuitous" in that Congress was never compelled to grant amnesty to illegal aliens. Thus, defendants could argue, Congress did not have to provide due process because it was conferring an unwarranted benefit.

This argument is nothing more than a revival of the discarded "right-privilege" distinction. According to the right-privilege distinction, governmentally conferred "privileges" (as opposed to "rights") may be given to recipients on the condition that they give up constitutional rights that they otherwise would enjoy. *See generally United Pub. Workers v. Mitchell,* 330 U.S. 75, 67

S.Ct. 556, 91 L.Ed. 754 (1947); *cf. Willner v. Committee on Character,* 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) (holding denial of admission to state bar is denial of right, and thus due process is required). The Court refuses to revive the right-privilege distinction, oft declared dead by the Supreme Court. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 360–61, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976); *Sugarman v. Dougall,* 413 U.S. 634, 644, 93 S.Ct. 2842, 2848, 37 L.Ed.2d 853 (1973); *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). Therefore, neither *Jay's* holding nor its rationale control the present case.

Frankfurter observed: "Secrecy is not congenial to truth-seeking.... No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).[9]

This principle is so central to due process that the Supreme Court has declared it "relatively immutable":

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

*Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).

The INS's reliance on undisclosed, classified information in this case imposes on plaintiffs the nearly impossible burden of proving two negatives—that they are not members of the PFLP, and that the PFLP does not advocate any of the statutorily-disapproved doctrines. In *Rafeedie II,* the D.C. Circuit likened such a position to the dilemma faced by Joseph K. in Franz Kafka's *The Trial,* and concluded that "[i]t is difficult

to imagine how even someone innocent of all wrongdoing could meet such a burden." *Rafeedie II,* 880 F.2d at 516.[10]

If the INS were to allow access to the classified information (or perhaps some proxy summary of the classified information) it would significantly reduce the risk of an erroneous determination of plaintiff's applications. However, the Notices of Intent to Deny provide very little information to plaintiffs. The Notices state that the plaintiffs are members of the PFLP, which is an organization that advocates doctrines disapproved under 8 U.S.C. § 1182(a)(28)(F). The Notices do not identify any evidence supporting the allegations regarding the plaintiffs' connection with the PFLP. Instead, they merely state that "classified information" supports these charges. Because the risk of error is so high under these circumstances, this factor also tilts heavily in favor of the plaintiffs.

■ Plaintiffs' interests must be balanced against the Government's interest in keeping certain information confidential because of national security concerns, together with the Government's interest in denying legalization to persons who are members of a group that advocates doctrines disapproved under § 1182(a)(28)(F). The Court is convinced these are serious interests. The INS submitted the classified information to be used against Barakat and Sharif to the Court *in camera.*[11] The Court has carefully reviewed

9. *See also United States v. James Daniel Good Real Property,* —— U.S. ——, —— ——, 114 S.Ct. 492, 501–02, 126 L.Ed.2d 490 (1993) (holding that *ex parte* preseizure proceeding creates an unacceptable risk of error).

10. The Court notes that the burden of proof is on plaintiffs in the IRCA proceeding. Thus, they will have to affirmatively prove both negative propositions. The Court finds that this further increases the risk of error.

11. Plaintiffs have continuously and strenuously objected to the presentation of this information *in camera* and *ex parte.* They allege that the Court may not decide the case on the basis of these documents, since plaintiffs have not had the chance to rebut the allegations. The Court disagrees with the plaintiffs. In *Molerio v. FBI,* 749 F.2d 815 (D.C.Cir.1984), the District of Columbia Circuit approved of the use of classified information *in camera* and *ex parte* to resolve the merits of an FBI agent's civil claim. The court relied on the state secrets privilege, which pro-

tects from disclosure information that would result in "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C.Cir.1983) (footnote omitted), *cert. denied, Russo v. Mitchell,* 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984). Although the state secrets privilege has not been formally invoked in this case, the Court has reviewed the classified material and determined that it is amenable to state secrets protection. Hence, the Court may decide this case on the basis of this classified information. *But see Abourezk v. Reagan,* 785 F.2d 1043, 1060–61 (D.C.Cir.1986), *aff'd mem. by an equally divided court,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).

Even if the state secrets privilege is inapplicable in this case, the Court holds that there is an alternative basis for considering the *in camera* submission. The Court needs to make a *Mathews* determination regarding whether confiden-

the *in camera* submission, and agrees that the Government has a strong national security interest in keeping the information confidential. Furthermore, the submission indicates that Barakat and Sharif are members of the PFLP, and that the PFLP advocates the doctrines listed in § 1182(a)(28)(F).[12] Therefore, the Government has at least some national security interest in denying plaintiffs' legalization.

■ After much consideration, the Court concludes that the use of undisclosed, confidential information violates plaintiffs' due process rights on the facts of this case. First, the procedures used by the INS create a risk of error that is simply too high in the present case. The Notices of Intent to Deny offer only vague allegations about plaintiffs membership in the PFLP. Plaintiffs will literally find it impossible to rebut the allegations. After reviewing the *in camera* submission, the Court finds that the Government could reveal to plaintiffs at least some of the confidential information it intends to use without compromising national security. The Government has specifically stated, however, that it does not intend to provide plaintiffs with any access to the confidential information. *See* Defendant's First Response to the Discovery Order of January 7, 1994, Re-

lating to Legalization at 1. This fact makes the present case even stronger than *Rafeedie III*, 795 F.Supp. at 20–21, where the Court noted the possibility that the INS might provide more extensive procedural protections not required by statute. Were the Government willing to provide even a summary of the specific allegations against plaintiffs, due process might be satisfied. But as applied to plaintiffs, the INS procedures deny plaintiffs any meaningful opportunity to challenge the Government's accusations and therefore violate due process.

■ Second, the Government's interest is not sufficiently compelling to outweigh plaintiffs' weighty interests. Having reviewed the Government's *in camera* submission, the Court is not convinced that the Government's security interest in allowing Barakat and Sharif to stay in the country is very weighty.[13] The court must, to some extent, defer to the INS's allegations of threats to national security. "[I]t must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the Executive and the Legislature." *Plasencia*, 459 U.S. at 34, 103 S.Ct. at 330. Despite the deference that the Court must give to the INS in these matters, however, the Court does not believe

tial information can be used in adjudicating plaintiffs' applications. To make this determination, the Court needed to review the *in camera* submission to determine what type of confidential information is involved. Accepting plaintiffs' position regarding the *in camera* submission would place the Court in a "Catch–22" position of needing to make a determination as to the procedural fairness of allowing the INS adjudicator to consider the information while simultaneously the Court would be unable to examine the information. "Blindfolded" judging is not required. The Court has therefore considered the *in camera* submission. *See generally El–Werfalli v. Smith*, 547 F.Supp. 152, 154 (S.D.N.Y. 1982) (allowing *in camera* judicial consideration of confidential information); *Azzouka v. Sava*, 777 F.2d 68 (2nd Cir.1985), *cert. denied*, 479 U.S. 830, 107 S.Ct. 115, 93 L.Ed.2d 62 (1986) (same).

**12.** The submission does not, however, indicate that Barakat and Sharif personally advocate the doctrines, nor does it indicate that they have personally participated in any 'terrorist' activity.

**13.** The INS does not argue that the Court may not evaluate the asserted national security inter-

est. Nevertheless, the Court has considered the possibility that it may not have the competence to weigh national security concerns. The Court can find no case indicating that it does not have authority to weigh national security concerns. On the contrary, courts often do so. *See, e.g., United States v. United States Dist. Court*, 407 U.S. 297, 320–21, 92 S.Ct. 2125, 2138, 32 L.Ed.2d 752 (1972) ("We cannot accept the Government's argument that internal security matters are too subtle and complex for judicial evaluation. Courts regularly deal with the most difficult issues of our society. There is no reason to believe that federal judges will be insensitive to or uncomprehending of the issues involved in domestic security cases."); *Haig v. Agee*, 453 U.S. 280, 308–09, 101 S.Ct. 2766, 2782–83, 69 L.Ed.2d 640 (1981) (holding that the government has authority to revoke a passport where the holder's activities jeopardized the security of the United States); *Zweibon v. Mitchell*, 516 F.2d 594, 643 (D.C.Cir.1975) ("[J]udges do, in fact, have the capabilities needed to consider and weigh data pertaining to the foreign affairs and national defense of this nation."), *cert. denied, Barrett v. Zweibon*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

that granting legalization to these particular plaintiffs will be a significant threat to national security. The Court acknowledges that for the purposes of this opinion, it must assume that § 1182(a)(28)(F) is constitutional. However, this does not mean that *substantial* national security interests are implicated simply because aliens who belong to an organization that advocates particular doctrines will be granted legal status. While the Government made a strong showing that Barakat and Sharif are affiliated with the PFLP, it has not shown that Barakat and Sharif personally have advocated any of the doctrines of 8 U.S.C. § 1182(a)(28)(F). These particular plaintiffs have never been charged with any crime, and there is no indication that they are violent terrorists.[14] If the INS had made a stronger showing that allowing these particular plaintiffs to stay in the country would create a serious threat to national security, the balance might very well have tipped in the Government's favor.[15]

In sum, the facts of this case support the conclusion that the balance tips in plaintiffs' favor. Plaintiffs' interest in obtaining legalization is substantial. The vague allegations of the government regarding plaintiffs' PFLP membership, combined with the government's refusal to provide plaintiffs with even a summary of the allegations, creates a very high risk of error in this case. Finally, the government's national security interests are not very weighty when compared to the interests of these plaintiffs. Therefore, the Court holds that plaintiffs' due process rights would be violated by the INS's use of undisclosed, classified information in the IRCA legalization proceeding.[16] THE COURT GRANTS SUMMARY JUDGMENT FOR PLAINTIFFS ON THE DUE PROCESS CLAIM.

**14.** In fact, former FBI Director William Webster admitted that plaintiffs "had not been found to have engaged themselves in illegal activity ... [and that] if these individuals had been United States citizens, there would not have been a basis for their arrest." *Nomination of William H. Webster, to be director of Central Intelligence, Hearings Before the Senate Select Comm. on Intelligence, 100th Cong., 1st Sess.* 94–95 (1987).

**15.** The Court does not doubt that the revelation of the confidential information would jeopardize national security. The INS may avoid revealing the confidential information, however, by proceeding against plaintiffs with evidence that the INS is willing to put on record. Of course, if the INS is unable to use its confidential information, plaintiffs may have an increased possibility of obtaining legalization. For the reasons stated in the text, the Court finds that the increased likelihood of plaintiffs obtaining legalization does not significantly threaten national security.

**16.** The Court has limited its holding to the facts of this case. The Court notes that the D.C. Circuit has interpreted *Mathews* and similar cases to require that courts look at more than just the special circumstances of a particular case. Rather, the *Rafeedie II* court pointed out, courts are to consider the general attributes of the type of case it is. *Rafeedie II*, 880 F.2d at 524 (citing *Santosky v. Kramer*, 455 U.S. 745, 761–68, 102 S.Ct. 1388, 1399–1402, 71 L.Ed.2d 599 (1982); *Mathews*, 424 U.S. at 340–50, 96 S.Ct. at 905–10; and *Goldberg v. Kelley*, 397 U.S. 254, 264–66, 90 S.Ct. 1011, 1018–19, 25 L.Ed.2d 287 (1970); *but see Lassiter v. Department of Social Services*, 452 U.S. 18, 32–33, 101 S.Ct. 2153, 2162, 68 L.Ed.2d 640 (1981)). While this Court believes that cases should be decided on the basis of facts before the Court, it also believes that the result would be the same if it adopted the *Rafeedie II* approach.

Over the past few decades, the INS has traditionally relied upon confidential information primarily in making discretionary decisions. As of May 1990, approximately 96% of the 1.76 million applications filed under the IRCA legalization provisions had been adjudicated. Thomas A. Aleinikoff & David A. Martin, *Immigration Process and Policy*, 679 n. 25 (2nd Ed.1991). Yet it was not until 1991 that the INS decided it needed to use undisclosed, confidential information to rule on the non-discretionary legalization claims. The Court ordered the INS to disclose how many times they had used confidential information to deny IRCA applications; the INS could find only four such proceedings. *See* Defendants' Supplemental Discovery Response Pursuant to the Court's June 29, 1994, Order. Since the INS could find only four cases where it felt it had to rely on undisclosed, confidential information, and since the INS did not use such information in these types of cases at all prior to 1991, the Court finds that such information need not be considered in the typical legalization case. In the vast majority of cases, the INS is able to function effectively by disclosing all evidence to applicants. The INS has not adequately explained which national security concerns prompted the need to begin to use undisclosed, confidential information in 1991. Thus, these cases do not support a showing of a general need for the use of undisclosed, classified information in IRCA legalization cases. Because the INS has failed to show the need to use undisclosed, confidential information in general, the Court would come to the same result if it were to consider the general type of case that this is.

To obtain a permanent injunction, plaintiffs must show irreparable injury and inadequacy of legal remedies. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988). As plaintiffs will be irreparably injured if the INS uses undisclosed information in the legalization proceedings, and as plaintiffs have no remedy at law, the Court further holds that injunctive relief is proper in this case. DEFENDANTS ARE ENJOINED FROM USING UNDISCLOSED INFORMATION TO ADJUDICATE PLAINTIFFS' LEGALIZATION APPLICATIONS.

IV. First Amendment Claim

Plaintiffs assert that the First Amendment requires heightened procedural protections whenever the Government seeks to dispense punishment or benefits on the basis of speech. The only authority they cite for this proposition is *Freedman v. Maryland*, a prior restraint case that holds that strict procedural safeguards are required when the Government licenses films. 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Government film licensing proceedings are not at all similar to immigration hearings. Censorship hearings require complicated procedures to avoid prior restraint of protected activity. Immigration hearings, on the other hand are more similar to standard trials. The Court knows of no case holding that the First Amendment requires heightened procedural safeguards in such settings. Rather, the *Mathews v. Eldridge* test is used to determine proper procedural safeguards. *See supra* part III. Because film licensing proceedings and immigration hearings are so dissimilar, and because the due process and First Amendment challenges are indistinguishable, the Court declines to extend *Freedman* to the immigration context.

As the Court declines to hold that the First Amendment requires additional procedural safeguards in this situation, THE COURT GRANTS SUMMARY JUDGMENT FOR THE DEFENDANTS ON THE PROCEDURAL FIRST AMENDMENT CLAIM.

IT IS SO ORDERED.